**STATE of Iowa, Appellee,**

v.

**Scott Arthur LIMBRECHT, Appellant.**

No. 98–807.

Supreme Court of Iowa.

Sept. 9, 1999.

Linda Del Gallo, State Appellate Defender, and Patricia Reynolds, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor and Thomas Andrews, Assistant Attorneys General, and Cynthia Voorde, County Attorney, for appellee.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and SNELL, JJ.

NEUMAN, Justice.

The only issue on this appeal is whether the record adequately supports a conviction for the crime of stalking in violation of Iowa Code sections 708.11(2) and 708.11(3)(c) (1997). The defendant, Scott Limbrecht, contends the court erroneously denied his motion for judgment of acquittal. He claims the State may have proved his conduct toward the victim was unwanted and unpleasant but it has failed to establish a course of conduct that would put a reasonable person in fear of bodily injury or death, or that his conduct induced such fear in the victim here. Because we believe the record amply demonstrates substantial support on each essential element of the crime charged, we affirm the judgment of the district court.

## I. Scope of Review.

■■■ On appeal from the denial of a motion for judgment of acquittal, we review the record in the light most favorable to the State, accepting all legitimate inferences that may fairly and reasonably be drawn from the evidence. *State v. Sanborn*, 564 N.W.2d 813, 816 (Iowa 1997). That record must show that the State produced substantial evidence on each of the essential elements of the crime. *State v. Harrison*, 325 N.W.2d 770, 772–73 (Iowa App.1982). Evidence is substantial if it could convince a rational fact finder of the defendant's guilt beyond a reasonable doubt. *Sanborn*, 564 N.W.2d at 816.

With these principles in mind, we turn to the evidence produced at trial.

## II. Facts.

Defendant, Scott Limbrecht, is a former inmate of the North Central Correctional Facility at Rockwell City. He has done time for sexual assault and arson, among other crimes. While in prison he became acquainted with Stacy Corey, a young woman hired by the prison as an activities specialist. For nearly three years Stacy supervised the prison's library, craft, and gym areas. During the last six months of her tenure, she began receiving a great deal of unsolicited attention from Scott Limbrecht.

Limbrecht was assigned to maintenance duties at the prison. The record reveals he repeatedly sabotaged the weight machine, located near Stacy's work station, so he could be dispatched to fix it. Whether fixing the machine, or regularly working out on it, Limbrecht would use the time to stare at Stacy. His unrelenting gaze made her uncomfortable to the point of feeling "mentally undressed" by him. Limbrecht's use of library privileges also increased substantially. His book requests changed from scientific topics to female anatomy. Increasingly uncomfortable with these contacts, Stacy asked coworkers to deliver the books to Limbrecht and, at her urging, prison officials eventually moved the weight machine to another location.

During this same time frame, Stacy and other prison administrators received anonymous inmate letters, known as "kites," which described sexual encounters between Stacy and inmates, including Limbrecht. Stacy suspected Limbrecht authored the kites. At trial an inmate revealed that Limbrecht claimed he was having an affair with Stacy and the two had engaged in sexual relations in her office. When Stacy was pregnant, Limbrecht boasted the baby might be his and that he could "take" Stacy's husband if there were a confrontation over the child's paternity. Limbrecht reportedly said he would "do whatever it took to find out [about the child] if he had to go to her house, find out where she lived."

Troubled and upset by these events, Stacy terminated her employment at the prison on July 1, 1996. Limbrecht was discharged in November 1997.

Limbrecht resurfaced in Stacy's life late in December 1997, leading to the charge at issue on this appeal. Stacy's husband, Perry, received an anonymous Christmas card alleging in very graphic terms that

his wife had cheated on him with inmates at the correctional facility. Stacy recognized Limbrecht's handwriting and contacted authorities immediately. She testified that the note left her feeling "shocked. Scared. Sick."

Within two weeks the Coreys received a similar letter. They were alarmed that it was correctly addressed to their new home in rural Lake City, even though their new address had not yet been published in the telephone book. (The Christmas card had merely been forwarded to them by the post office.) Authorities determined that the letter, as well as the card, matched known handwriting samples obtained from Limbrecht.

The Coreys' new home was situated on an isolated country road. Their road extended only four miles, passing about eight houses before stopping at a dead end. Because there was no commercial business along the route, the traffic passing by was customarily limited to other residents.

The Coreys learned that Limbrecht drove a rusty brown Toyota, 1983 model. On January 13, 1998, Stacy saw a car matching Limbrecht's near the turnoff to her road as she was coming home from work. Five days later, as she was looking out her home's front picture window, she saw the vehicle pass by. She spotted the vehicle again the next day, passing her home at about 11 a.m. Around 1 p.m., when her husband was returning to work after coming home for lunch, he saw the same car and followed it back toward the house. He noted the car drove slowly by their home until the driver noticed Perry behind him and then sped up. The Coreys alerted the sheriff's department.

Later that afternoon Stacy saw the same brown Toyota drive by her home for the third time that day. Her husband took off after the vehicle while Stacy called the sheriff's office for help. A cat-and-mouse chase ensued, with Perry identifying Limbrecht as the driver and Limbrecht staring him down as he passed. At one point Limbrecht stopped his car and jumped out, indicating to Perry that he wanted to fight. Perry refused to exit his truck, and Limbrecht sped off. He was eventually stopped by a sheriff's deputy and arrested for stalking.

### III. Issue on Appeal: Sufficiency of the Evidence.

■ Limbrecht contends that the record sketched above contains insufficient evidence to sustain a conviction for stalking. He maintains that the Christmas card and other letter, while perhaps offensive, contained no threats of harm. He claims the reported sightings of a vehicle matching his revealed no unusual driving behavior. He emphasizes that no one identified him as the driver during the first four alleged "drive-bys," thus minimizing any perceived threat of danger. Finally, he contends the "chase" involved Perry, not Stacy, and could not reasonably be considered part of a course of conduct directed at Stacy. The fact that no weapon was found in the car, he argues, reinforces his claim that no fear-inducing conduct was established.

The State counters that Limbrecht mischaracterizes both the evidence and the proof required by section 708.11(2). For the reasons that follow, we are inclined to agree.

Iowa's stalking statute, section 708.11(2), contains three essential elements. They are:

*a.* The person purposefully engages in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to, or the death of, that specific person or a member of the specific person's immediate family.

*b.* The person has knowledge or should have knowledge that the specific person will be placed in reasonable fear of bodily injury to, or the death of, that specific person or a member of the specific person's immediate family by the course of conduct.

c. The person's course of conduct induces fear in the specific person of bodily injury to, or the death of, the specific person or a member of the specific person's immediate family.

Iowa Code § 708.11(2); *State v. Bellows,* 596 N.W.2d 509, 511 (Iowa 1999); *State v. Neuzil,* 589 N.W.2d 708, 710 (Iowa 1999). Except in circumstances not pertinent here, first-offense stalking is an aggravated misdemeanor punishable by imprisonment not to exceed two years. Iowa Code § 708.11(3)(c); *see* Iowa Code § 903.1(2) (penalties for aggravated misdemeanor).

Limbrecht's first argument–that his writings to Perry Corey contained no explicit threats and, therefore, were not fear-producing–harkens back to the former version of Iowa's stalking statute, which required proof of a "credible threat" against another person. *See* Iowa Code § 708.11(1)(a) (1993). The 1993 statute defined "credible threat" as "a threat made with the intent to place a reasonable person in like circumstances in fear of death or bodily injury, coupled with the apparent ability to carry out the threat." *Id.* § 708.11(1)(b)(1). The statute was amended in 1994. *See* 1994 Iowa Acts ch. 1093, § 4. The current statute requires no such proof of specific intent. *Neuzil,* 589 N.W.2d at 711. Instead of targeting a "credible threat," the statute criminalizes a "course of conduct" that may or may not include threats. *See* Iowa Code § 708.11(1)(b) (1997). "Course of conduct" is defined as "repeatedly maintaining a visual or physical proximity to a person without legitimate purpose or repeatedly conveying oral or written threats, threats implied by conduct, or a combination thereof, directed at or toward a person." *Id.* "Repeatedly," as defined by the statute, "means on two or more occasions." Iowa Code § 708.11(1)(d).

The record before us furnishes persuasive proof that Limbrecht placed himself in physical proximity to Stacy on four or five occasions in mid-January 1998 without legitimate purpose. The fact that the letters preceding his drive-bys contained no explicit threats makes them no less threatening when considered in context. Stacy had experienced, firsthand, Limbrecht's voyeuristic propensities at the prison. She was familiar with his criminal record of sexually assaultive behavior. She knew that he had authored the "kites," which falsely accused her of sexual misconduct with him and other inmates. Thus what might be considered a harmless infatuation in another context assumed frightening proportions here.

The harmlessness Limbrecht ascribes to the "drive-bys" is equally unpersuasive. The Coreys had armed themselves with information about the make and model of Limbrecht's car, even traveling to his mother's home in Carroll to observe it firsthand. A sheriff's deputy testified there was no other similar Toyota Celica in the .vicinity. Thus, although the Coreys could not specifically identify Limbrecht as the brown Toyota drove by their home, it was not unreasonable for them to assume Limbrecht was at the wheel. Their home was situated on a minimally traveled gravel road. Given their knowledge that Limbrecht boasted of finding out where Stacy lived and "taking" her husband in any confrontation, his presence in their quiet rural neighborhood was surely threatening.

We thus conclude the State offered substantial evidence on the first element of the offense–a purposeful engagement in a course of conduct that would cause a reasonable person to fear bodily injury to a specific person, *i.e.,* Stacy Corey.

That brings us to Limbrecht's argument that, although Stacy was identified as the victim, most of the State's proof focused on conduct directed at her husband, Perry. Again, we believe Limbrecht mischaracterizes the proof. Stacy was the object of Limbrecht's voyeurism. It was about her that he boasted to other prison inmates. While the evidence suggests legitimate fear by Perry of a possible assault, it also

amply supports a finding that Limbrecht's course of conduct had Stacy as its focus.

■ Limbrecht does not seriously contest the proof tendered on the second element of the offense—that he would have known his conduct would place Stacy in reasonable fear of bodily injury. The record reveals that Stacy rebuffed Limbrecht's advances at the prison, dealing with him curtly and eventually avoiding contact with him altogether. It can be inferred from the record that he knew she would be knowledgeable about his history of sexual assault. His pursuit of her and her family, without legitimate purpose, could reasonably be inferred to have been done with the knowledge that his conduct would cause fear of bodily injury.

■ Finally, the record amply establishes that Limbrecht's course of conduct induced fear in Stacy Corey and her family. She and her husband testified at length about safety precautions taken as a result of Limbrecht's actions, including the installation of dead bolt locks, extra lights, and motion detectors. They began carrying two-way radios. Sheriff's deputies were regularly dispatched to their home. Stacy bought a gun and learned to use it.

In summary, we conclude that although Limbrecht's acts considered in isolation might be described as no more than offensive or harassing, taken together they reveal a course of conduct that would cause a reasonable person to fear physical harm to Stacy Corey. The State produced substantial evidence on each of the essential elements of stalking in violation of Iowa Code section 708.11(2). We accordingly affirm the judgment and sentence entered by the district court.

**AFFIRMED.**