STATE OF CONNECTICUT *v.* LESLIE RUSSELL
(AC 26026)

Flynn, C. J., and Rogers and Pellegrino, Js.

Argued October 27, 2006—officially released May 22, 2007

*Eugene J. Riccio*, with whom was *Richard Emanuel*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

ROGERS, J. The defendant, Leslie Russell, appeals from the judgments of conviction, following a jury trial, of two counts of stalking in the third degree in violation of General Statutes § 53a-181e (a),[1] two counts of criminal violation of a protective order in violation of General Statutes § 53a-223 (a)[2] and one count of burglary in the second degree in violation of General Statutes § 53a-102 (a) (1).[3] He claims on appeal that the evidence presented at trial was insufficient to support his conviction on each of these charges. The state concedes that the evidence was insufficient as to one count of stalking in the third degree but contests the defendant's claims as to his conviction of the remaining charges. We agree with the parties that the conviction of one of the stalking charges lacks evidentiary support and conclude further that the state failed to prove that the defendant committed burglary but disagree with the defendant's remaining claims. We therefore affirm in part and reverse in part the judgments of the trial court.

[1] General Statutes § 53a-181e (a) provides that "[a] person is guilty of stalking in the third degree when he recklessly causes another person to reasonably fear for his physical safety by wilfully and repeatedly following or lying in wait for such other person."

[2] General Statutes § 53a-223 (a) provides in relevant part that "[a] person is guilty of criminal violation of a protective order when an order issued pursuant to . . . section 54-1k . . . has been issued against such person, and such person violates such order."

General Statutes § 54-1k requires, as a condition of bail or release, the issuance of a protective order against a person who has been arrested for, inter alia, a violation of General Statutes § 53a-181e. See footnote 1. It provides, in relevant part, that such protective order "may include provisions necessary to protect the victim from threats, harassment, injury or intimidation by the defendant, including but not limited to, an order enjoining the defendant from (1) imposing any restraint upon the person or liberty of the victim, (2) threatening, harassing, assaulting, molesting or sexually assaulting the victim, or (3) entering the dwelling of the victim. . . ."

[3] General Statutes § 53a-102 (a) provides that "[a] person is guilty of burglary in the second degree when such person (1) enters or remains unlawfully in a dwelling at night with intent to commit a crime therein . . . ."

The defendant's convictions stem from his conduct toward the victim over a period of years. In regard to those actions, the jury reasonably could have found the following facts. The defendant and the victim, a mother of triplets who was separated from her husband, met some time in 2001 and dated on again, off again until January, 2003, when the victim finally broke off the relationship. The defendant continued to pursue the relationship by writing to the victim and sending her flowers, but the victim did not respond.

On February 27, 2003, at approximately 11:30 p.m., the victim was in the dining room of her home in Newtown, reading while her children slept upstairs. The weather was bitterly cold, and the victim heard crunching noises in the frozen snow on the ground outside. She saw a "dark figure" looking through her dining room window. Thinking it was a burglar, she called 911, and the police responded shortly thereafter to find her upset and frightened.

Outside, the police found footprints near the dining room window that led off into a wooded area. The footprints led generally in the direction of Old Gate Lane, a nearby street. The police followed the footprints and, along the way, discovered a black knit hat and a flashlight.

While speaking with the victim, the police indicated that they were checking on a car parked on Old Gate Lane that was registered to an individual named Leslie Russell, i.e., the defendant. Upon receiving that information, the victim explained that she had been dating that individual and that he probably had come by to leave something in her mailbox.[4] In the presence of the police, she called the defendant's cellular telephone and left him a voice message, informing him that the police had

---

[4] During the course of their relationship, the defendant had on occasion left correspondence in the victim's mailbox.

found his car and were looking for him. After leaving the victim's house at about 2 a.m., the police went to the defendant's home, also in Newtown, but he was not there.

The following morning at approximately 8 a.m., police were dispatched to a commuter parking lot off Interstate 84 in Newtown in response to a report of a disoriented man who had called 911 from a pay telephone. The disoriented man was the defendant. The lot was five to six miles from the victim's home. The defendant appeared dazed and was unsure how he had gotten to the commuter lot. He complained of head and leg pain but had no visible injuries and refused treatment. The defendant last recalled driving or parking his car near the victim's house.[5] He told the police that he often drove by the victim's house, or parked in the neighborhood and walked by, at various times such as before and after his workday or on his lunch hour. The defendant characterized his visits as "therapy for him" and acknowledged that the victim, who was unaware of those visits, would be upset if she knew. Thereafter, the police informed the victim of the defendant's frequent drives past her home.[6]

That same morning, the police photographed the defendant's car, which remained parked on Old Gate

---

[5] The defendant testified similarly at trial, claiming that he had gone to the victim's house at about 8:30 or 9 p.m. to leave a letter in her mailbox and that, before arriving at the commuter lot the following morning, his last recollection was walking back to his car on Old Gate Road. Although the defendant did not recall being outside of the victim's house later that evening, he conceded that it was "very, very likely" that he was there.

[6] The victim testified that upon learning that it was the defendant outside of her home on February 27, 2003, she had "mixed emotions. I was appalled that he would do this, I thought we were friends, even though we stopped seeing each other . . . and I'm scared that someone I thought I knew could do this." She characterized the defendant's actions as "not normal behavior." The victim indicated further that after she had heard about the defendant's statements to the police regarding the extent of his visits, she became concerned for her safety.

Road. On the front passenger seat, the police photographer observed what appeared to be a black knit ski cap with eye and mouth holes cut into it. A neighborhood resident who looked in the car also saw a ski mask on the seat, as well as a flashlight. According to that neighbor, the defendant's car had been parked there frequently, beginning in July, 2001.[7]

As a result of the foregoing events, the defendant was arrested and charged with stalking in the third degree.[8] When he was arraigned on that charge on March 17, 2003, a protective order was issued pursuant to General Statutes § 54-1k.[9] See footnote 2. The protective order required the defendant to refrain from, inter alia, stalking the victim, entering her dwelling or coming within 100 yards of her.

The next incident underlying the defendant's conviction occurred about seven months later, on October 5, 2003. At that time, the victim was a Girl Scout leader, and two of her children were Girl Scouts. On the weekend of October 4 and 5, 2003, the victim, her daughters and the rest of their troop went camping at Housatonic Meadows State Park (campground) in Sharon, which is forty-five minutes to an hour from Newtown. On Saturday, rain fell torrentially, so the group, after setting up camp, decided to return home to Newtown. On Sunday, they returned to the campground. At approximately

[7] The neighbor, Wendy Suckow, testified that the defendant's car had been parked in front of her house three to four times per week, between 9 p.m. and 11:30 p.m., but that she never saw anyone inside the car.

The defendant confirmed that he parked in front of Suckow's home starting in July, 2001, but differed as to the frequency and length of his visits. According to the defendant, he did so to "stimulate creativity" for writing poetry. He claimed that for the most part, he remained in his car.

[8] The state ultimately did not pursue this charge, and, therefore, it is not at issue in the present appeal.

[9] At trial, the defendant acknowledged that a valid protective order was in existence, that he was served with it and that it was issued in connection with a stalking case.

2 p.m., the defendant approached the group's campsite and began speaking with two of the adult troop leaders. At the time he approached the campsite, the victim was in a nearby restroom.

While the defendant and the troop leaders spoke, one of the victim's daughters walked up and stated that she knew the defendant, referring to him by name. The defendant looked at the daughter and smiled but did not respond otherwise. One of the adults, Donna Herring, recognized the name and was aware that there was a protective order requiring the defendant to stay away from the victim. When the victim emerged from the bathroom, Herring intercepted her, informed her that the defendant was there and led her behind a van that was parked near the campsite. The defendant continued to speak with the other leader and, after giving the group a bag of tomatoes, walked away from the campsite. He had been present at the victim's campsite for about ten minutes.

The victim immediately reported the incident to the state police.[10] A warrant was issued for the defendant's arrest, and he was charged with one count of criminal violation of a protective order. At the defendant's arraignment on November 18, 2003, a second protective order was issued that contained prohibitions similar to those in the March 17, 2003 protective order. The defendant later was charged in a substitute information with an additional count of stalking in the third degree in connection with the campground incident.

Given the defendant's appearance at the remote campground, the victim was concerned that he was somehow privy to her schedule. Accordingly, she purchased a "spy camera" disguised as a flower pot, which she installed on top of her refrigerator. Images captured by

---

[10] The victim initially spoke with the Newtown police, who referred her to the state police because the incident had occurred at a state park.

the camera were recorded on a videocassette recorder located in the victim's bedroom. The camera faced a clock and the victim's wall calendar, on which she recorded many of her and her children's planned appointments and events.[11]

On the evening of Friday, January 9, 2004, the victim went out to dinner with some friends. Her children were with their father, as was usual on Fridays, a fact of which the defendant was aware. When the victim returned home at about 11 p.m., she played the video-taped footage that her camera had recorded while she was out. The tape showed that between 10 and 10:40 p.m., an individual, whom the victim recognized as the defendant,[12] had moved throughout the kitchen and, apparently, elsewhere within the house. At the outset, the individual exited the kitchen through a passage leading to the victim's family room, where she kept a large dog crated. While in the kitchen, the individual repeatedly looked through the victim's calendar, and he removed her telephone from the wall and accessed information in its caller identification unit. He opened a set of louvered doors behind which the victim kept a bag containing discarded mail for recycling. The individual looked through the bag, removed some of the papers from within and tucked them into his waistband near the small of his back. Although $106 in cash was secured to the front of the victim's refrigerator, the individual did not take it.

After viewing the tape, the victim locked herself in her bedroom and called the police. When the police

[11] The victim kept another calendar, which she used similarly, in a separate work area elsewhere in the house.

[12] The individual was wearing heavy winter clothing, including two-toned boots, a ski cap, a light hooded sweat jacket beneath a dark hooded coat and a scarf around most of his face. At trial, the victim testified that she recognized the individual as the defendant on the basis of his stature, his height and weight, his walk, his long, thin legs, his skin color and his left-handedness. She also believed she could see his eyes. At trial, the tape was played for the jury.

arrived, the victim urged them to check the house for an intruder. No intruder was found, and there were no signs of forced entry. On the basis of information supplied by the victim, a search warrant was obtained for the defendant's vehicle and residence. Upon executing that warrant, the police seized several flashlights, a black knit cap and a gray hooded sweat jacket with rubber gloves in the pocket that was hanging on the defendant's bedpost. They photographed a pair of two-toned "duck" boots that were in the defendant's bedroom. The police did not recover a dark hooded coat or any personal papers of the victim. See footnote 12. When asked by police whether he had a key to the victim's house, the defendant immediately retrieved from a ring a key that matched a key the victim had provided.[13]

Thereafter, the defendant was charged with one count of stalking in the third degree, one count of criminal violation of a protective order and one count of burglary in the second degree. The files pertaining to the October 5, 2003 incident (campground incident) and the January 9, 2004 incident (home entry incident) were consolidated for trial. After a trial held on various dates in August and September, 2004, the jury found the defendant guilty on all of the counts charged.[14] This appeal

[13] At trial, the victim testified that she had never given the defendant a key and that one she had hidden under a lawn ornament was missing. The defendant testified that at one point during their relationship, he had taken the victim's house key to make himself a copy and that when he informed her that he was doing so, she did not say anything.

[14] As to the campground incident, the defendant was sentenced to five years imprisonment, execution suspended after fifteen months, and five years probation on the charge of criminal violation of a protective order and six months imprisonment on the charge of stalking in the third degree. As to the home entry incident, the defendant was sentenced to five years imprisonment, execution suspended after fifteen months, and five years probation on the charge of criminal violation of a protective order, five years imprisonment, execution suspended after fifteen months, and five years probation on the charge of burglary in the second degree, and six months imprisonment on the charge of stalking in the third degree. All of the sentences were to run concurrently.

followed. Additional facts and procedural history will be provided where necessary.

On appeal, the defendant claims that the evidence submitted at trial was insufficient to support his conviction on each of the counts charged. As to the conviction of stalking in the third degree stemming from the home entry incident, the state concedes that the defendant is correct because there was no evidence that the victim was home during that incident or that the defendant intended to confront her there, and hence, no evidence that the defendant followed or laid in wait for her. See footnote 1. Although we are not bound to accept concessions by a party on appeal; *State* v. *Harris*, 60 Conn. App. 436, 443, 759 A.2d 1040, cert. denied, 255 Conn. 907, 762 A.2d 911 (2000); it is clear from the record that the parties are correct that this conviction is not supported by the evidence. The remaining claims raised by the defendant are that the evidence was insufficient to support his convictions of (1) stalking in the third degree in connection with the campground incident because there was no evidence that he wilfully and repeatedly followed the victim or that he caused her to fear for her physical safety, (2) criminal violation of a protective order in connection with the campground incident because he did not stalk the victim or intentionally come within 100 feet of her during that incident, (3) burglary in the second degree in connection with the home entry incident because the predicate crime charged and instructed on was improper and (4) criminal violation of a protective order in connection with the home entry incident because there was no evidence that he violated the protective order in the specific manner in which the court instructed the jury. The defendant claims additionally that there was insufficient evidence to establish the element of identity for all of the charges stemming from the home entry incident.

Specifically, he argues that the victim's testimony identifying him as the person whose image was captured on the videotape was an impermissible lay opinion on an ultimate issue and otherwise unreliable.

We first note the standard of review governing claims concerning the sufficiency of the evidence and associated legal principles. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact]

may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 402–403, 902 A.2d 1044 (2006). We now turn to the claims on appeal.[15]

I

The defendant claims first that the evidence was insufficient to support his conviction for stalking in the third degree in connection with the campground incident. Specifically, he argues that there was no evidence that he wilfully followed the victim to her campsite, that he followed the victim repeatedly or that he recklessly caused the victim to fear for her physical safety, all of which are required for a conviction pursuant to § 53a-181e. We address these arguments in turn.

A

As to the defendant's argument that the state failed to prove that he wilfully followed the victim, the following

[15] At the close of the state's case-in-chief, the defendant filed a motion for a judgment of acquittal on the basis of insufficiency of the evidence. The court denied that motion, and the defendant proceeded to testify and present evidence on his behalf. Accordingly, in evaluating the defendant's sufficiency claim, we consider the evidence presented by the defendant as well as that submitted by the state. See *State* v. *Perkins*, 271 Conn. 218, 229, 856 A.2d 917 (2004).

additional facts are pertinent. When the victim complained to police subsequent to the campground incident, she conveyed her belief that the defendant knew she would be at the campground by somehow gaining access to her calendar, on which she noted all of her plans. That belief later proved unfounded, as there was no information recorded on the relevant days, October 4 and 5, 2003, indicating that the victim planned to be at the campground.[16] The victim testified, however, that at about the time in question, she kept personal papers and Girl Scout information, including permission slips, on her living room desk.

The defendant testified, in essence, that it was sheer coincidence that brought him to the remote campground on the same day as the victim and, further, directly to the victim's campsite with his offering of tomatoes. He claimed to have had no prior knowledge that the victim would be at the campground and also that he never even saw her there. He acknowledged that during the course of his relationship with the victim, he twice had shown up uninvited where the victim was camping, but he emphasized that on each of those occasions, the victim had told him where she was planning to be. According to the defendant, he was an avid camper[17] and was camping alone at Housatonic Meadows State Park from Friday, October 3, to Sunday, October 5, 2003, even though the weather was very bad and

[16] The victim and the Girl Scout troop originally had planned to camp on the weekend prior to the one in question but were rained out. Accordingly, the notation "G.S. Camping" appears on Saturday, September 27, 2003, on both of the victim's calendars, but no notation appears on either calendar for the weekend of October 4 and 5, 2003. Moreover, neither calendar identifies Housatonic Meadows State Park as the victim's intended destination. At trial, no evidence was presented to establish that the defendant knew that the victim and her daughters were involved with the Girl Scouts.

[17] The defendant also presented witnesses, namely, two friends and his former wife, who attested to his interest in camping. The victim testified, however, that she "was always talking about camping and [the defendant] never mentioned that he liked to go camping, too."

he had to return to Newtown to work for much of the day on Saturday.[18] He testified that he enjoyed getting away because it was quiet and peaceful and that he typically camped alone under all weather conditions.

By the defendant's account, he learned that Girl Scouts from Newtown were at the campground by speaking with a couple from Stamford named Bob and Miriam, who frequented Housatonic Meadows State Park.[19] The defendant testified that on Sunday morning, Miriam told him that the Newtown Girl Scouts had arrived Saturday and set up their campsite but that they had left because of the rain.[20] He stated that he broke down his campsite, then spoke with Bob and Miriam again at about noon and was told that the Girl Scouts had not yet returned. According to the defendant, after he distributed his leftover homegrown vegetables to people at the campground, some tomatoes remained, which he decided to leave for the Girl Scouts. He prepared a note to leave with the tomatoes, and Bob and

[18] The defendant's testimony and that of Bryan Sears, the campground's manager, as well as campground records, established that the defendant also camped at Housatonic Meadows State Park on the weekends of September 19 and 25, and October 10 and 24, 2003. According to Sears, when the defendant camped, he was not physically present. Rather, although his equipment was present at his campsite, neither he nor his vehicle were there. The defendant, however, testified that he enjoyed cooking and other activities at his campsite and socializing with others at the campground. He testified further that he parked at his campsite and, in addition to spending time at the campsite, would leave it to go hiking, fly-fishing and kayaking.

[19] On cross-examination, the defendant testified that he knew Bob and Miriam went to Housatonic Meadows State Park almost every weekend and was sure that campground records would reflect that. He confirmed, however, that he had made no effort to subpoena them in connection with this case.

[20] In this regard, the defendant's testimony was inconsistent with that of his coworker, Maureen Schaedler. Schaedler testified that when she saw the defendant at work on Saturday, prior to his claimed conversation with Bob and Miriam, he told her that he was camping at Housatonic Meadows State Park that weekend and that the Newtown Girl Scouts also happened to be there.

Miriam directed him to the Girl Scouts' campsite. As he approached, however, he noticed that they had returned, so he introduced himself and began conversing with the troop leaders.

The defendant testified that while he was at the Girl Scouts' campsite, his back was to the restroom area, and, therefore, he never saw the victim emerge and did not make eye contact with her. He acknowledged seeing the victim's daughter. The victim testified that when Herring confronted her as she exited the restroom, she saw the defendant. She estimated that when she saw him, they were twenty to twenty-five feet apart, and there was no obstacle between them. The victim did not think that she and the defendant made direct eye contact, nor did the defendant speak to her or otherwise indicate his awareness of her presence. Herring confirmed that the distance between the defendant and victim was "[a] length of a van and maybe a little more." She, too, was unsure whether the defendant saw the victim but testified that as he was speaking with the adults, "he was looking at the other people, the girls, and he was kind of like scanning as he was talking . . . ." Herring testified that the restroom was to the defendant's side and not to his back.

"To obtain a conviction for a violation of § 53a-181e, the state was required to prove, beyond a reasonable doubt, as follows: The defendant (1) recklessly (2) caused the victim to reasonably fear for [the victim's] physical safety when the defendant (3) wilfully and (4) repeatedly (5) followed or lay in wait[21] for the victim." *State* v. *Jackson*, 56 Conn. App. 264, 272, 742 A.2d 812, cert. denied, 252 Conn. 938, 747 A.2d 4 (2000).

The defendant argues that the state failed to prove that he followed the victim wilfully because there was

[21] In the present matter, the state's theory was that the defendant followed the victim. Thus, whether he lay in wait for her was not at issue.

no evidence that he knew the victim would be at the campground on October 5, 2003. He argues further that the proven circumstances of the campground incident did not demonstrate sufficiently that he was in the victim's presence or that he was in her presence for a substantial enough period of time so as to constitute "following." The defendant notes particularly the lack of evidence that he made eye contact with the victim. We are not persuaded.

In a previous appeal from a stalking conviction, this court explained that to follow means "to go, proceed, or come after and pursue in an effort to overtake. As used in . . . [§ 53a-181e], which requires that any following be wilful . . . the following must have a predatory thrust to it. The statute does not encompass following that is aimless, unintentional, accidental or undertaken for a lawful purpose. Of course, following implies proximity in space as well as time. Whether someone has deliberately maintained sufficient visual or physical proximity with another person, uninterrupted, over a substantial enough period of time to constitute following will depend upon a variety of differing factors in each case. These are appropriate issues for the trier of fact to decide . . . ." (Internal quotation marks omitted.) *State* v. *Jackson*, supra, 56 Conn. App. 272–73.

To determine whether the defendant wilfully placed himself in the vicinity of the victim, or rather, inadvertently and coincidentally happened across her at the campground, the jury was required to assess his intent. "[T]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Intent may be and usually is inferred from conduct . . . . [W]hether such an inference should be drawn is properly a question for a jury to decide." (Internal quotation

marks omitted.) *State* v. *Marsala*, 44 Conn. App. 84, 94, 688 A.2d 336, cert. denied, 240 Conn. 912, 690 A.2d 400 (1997).

"Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we will call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 93, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

We conclude that the jury properly inferred from the proven facts and circumstances that the defendant's presence at the campsite was a purposeful maneuver to place himself near the victim, i.e., that he acted wilfully. The state was not required to prove precisely how the defendant knew where the victim would be but only that he deliberately followed her there. Given the defendant's proven history of showing up uninvited where the victim was camping and his persistent efforts to be near her, the jury reasonably could have found that this was yet another such incident and not a mere

coincidence. The jury also might have considered it wholly implausible that the defendant, who apparently lived alone, would drive forty-five minutes to one hour on Friday to camp in torrential rain, only to have to return to Newtown to work a full day Saturday, then drive all the way back afterward and pack up to leave the following morning, all in search of peacefulness and solitude. The jurors also might have questioned why the defendant, who knew he was subject to a protective order requiring him to stay away from the victim, did not leave the area immediately after seeing the victim's daughter. We often have observed that, in assessing evidence, "jurors are permitted to rely on their everyday experience. Common sense does not take flight at the courthouse door." (Internal quotation marks omitted.) *State* v. *Brown*, 273 Conn. 330, 343, 869 A.2d 1224 (2005).

Although the defendant in testifying attempted to cast his presence at the remote campground and his approaching the victim at her campsite as purely coincidental occurrences, it is well established that the jury is the sole arbiter of witness credibility and may accept or reject, in whole or in part, the truth of any witness' testimony. See *Boles* v. *Commissioner of Correction*, 89 Conn. App. 596, 603–604, 874 A.2d 820, cert. denied, 276 Conn. 901, 884 A.2d 1024 (2005). The jurors in this case may have been influenced by inconsistencies between the defendant's testimony and that of other witnesses both generally and specifically regarding aspects of the campground incident and, as a result, concluded that the defendant was not credible. See footnotes 7, 13, 17, 18 and 20. This court may not revisit credibility determinations. See *Boles* v. *Commissioner of Correction*, supra, 603.

As to the defendant's claim that the evidence did not demonstrate that he was sufficiently proximate to the victim for a long enough period of time to constitute following, we similarly are unconvinced. Undisputed

testimony established that the defendant was within twenty-five feet of the victim, with no obstacles between them. Physical proximity thus clearly was proven. Compare *State* v. *Boscarino*, 86 Conn. App. 447, 455–56, 861 A.2d 579 (2004) (presence of defendant's resume among those collected insufficient evidence he attended job fair at same time as victim and hence followed her, where no indication he was seen, by victim or anyone else, in victim's vicinity). The victim's testimony that she saw the defendant also showed visual proximity, regardless of the lack of evidence that the defendant looked directly back at her. Moreover, we cannot find fault with the jury's determination that, under the circumstances, the ten minutes that the defendant was present at the victim's campsite was a substantial enough period of time to constitute following. See, e.g., *State* v. *Jackson*, supra, 56 Conn. App. 273–75 (holding three brief encounters sufficient proof of following for purpose of stalking conviction); cf. *People* v. *Curtis*, 354 Ill. App. 3d 312, 318, 820 N.E.2d 1116 (2004) (no minimum period of time defendant required to remain present outside victim's car to constitute "surveillance" within meaning of Illinois stalking statute), leave to appeal denied, 214 Ill. 2d 539, 830 N.E.2d 5, cert. denied, 546 U.S. 847, 126 S. Ct. 99, 163 L. Ed. 2d 114 (2005).

B

The defendant argues next that the campground incident and the February 27, 2003 incident in which he was outside the victim's window, having occurred approximately seven months apart, were too remote in time to establish that he followed the victim "repeatedly." See *State* v. *Jackson*, supra, 56 Conn. App. 272. We disagree.

As used within § 53a-181e, repeatedly "means precisely what the commonly approved usage of the word

suggests—*acting on more than one occasion.* An iso-lated act of following . . . cannot constitute stalking." (Emphasis added; internal quotation marks omitted.) Id., 273. The statute contains no explicit limitations as to the temporal interval between acts, and the defen-dant cites no authority directly in support of the propo-sition that occurrences separated by several months cannot be characterized as "repeated." We decline to read such a limitation into § 53a-181e. See *Vargas* v. *Doe*, 96 Conn. App. 399, 407–408, 900 A.2d 525 ("[w]e are constrained to read a statute as written . . . and we may not read into clearly expressed legislation provi-sions which do not find expression in its words" [inter-nal quotation marks omitted]), cert. denied, 280 Conn. 923, 908 A.2d 546 (2006). Here, the state proved more than one isolated instance of prohibited behavior, which is all that was required by the plain terms of § 53a-181e.

## C

The defendant argues last that there was no evidence that he caused the victim reasonably to fear for her physical safety. See *State* v. *Jackson*, supra, 56 Conn. App. 272. He refers to evidence indicating that, after the victim realized that it was the defendant looking in her window on February 27, 2003, she was not con-cerned for her safety.[22] He further cites, in contrast to the present matter, a case in which a defendant, convicted of stalking, had sent his victim threatening communications. See *State* v. *Marsala*, supra, 44 Conn. App. 86 n.3. We are not convinced.

---

[22] The defendant does not argue, however, that the evidence was insuffi-cient as to the victim's reasonable fear for her safety in connection with the campground incident. Consequently, our review is limited to the February 27, 2003 incident. Although we question whether the state, to obtain a conviction under § 53a-181e, needs to prove repeated instances of the victim's fear, as opposed to repeated instances of the defendant's behavior that causes such fear, we nevertheless will review the defendant's claim.

The following additional facts are relevant. When describing the events of February 27, 2003, the victim testified that upon seeing a dark figure outside her window, she was very scared and that it seemed like it took forever for the police to arrive, although it probably was only five minutes. One responding officer testified that the victim, initially, seemed upset, and another described her as "very upset" and "crying on the verge of hysterics." Following the February 27, 2003 incident, the victim installed light sensors around her home.

On cross-examination, the victim acknowledged that when she first learned that the figure outside her window was the defendant, she told police that she was not concerned for her safety because the defendant was a quiet person whom she recently had been dating. The responding officers confirmed that statement. The victim clarified, however, that she did not fear the defendant *until she heard of his statement to police*, in other words, until she learned that he repeatedly and frequently had been driving by and parking near her home. She also testified that upon learning that the dark figure was the defendant, she had mixed emotions, including being "scared that someone I thought I knew could do this," and feeling "mad, shocked, scared, everything."

"The standard to be applied in determining the reasonableness of the victim's fear in the context of the crime of stalking is a subjective-objective one." *State v. Cummings*, 46 Conn. App. 661, 678, 701 A.2d 663, cert. denied, 243 Conn. 940, 702 A.2d 645 (1997). As to the subjective test, the situation and the facts must be evaluated from the perspective of the victim, i.e., did she in fact fear for her physical safety? See id., 678 n.12. If so, that fear must be objectively reasonable, i.e., a reasonable person under the existing circumstances would fear for his or her physical safety. See id.; see also *State* v. *Culmo*, 43 Conn. Sup. 46, 65, 642 A.2d 90 (1993) ("The jury must view the situation from the

perspective of the [victim]. . . . [H]owever . . . the [victim's] belief ultimately must be found to be reasonable." [Internal quotation marks omitted.]).

In the present matter, the recited testimony clearly provided an adequate basis for the jury to find that the victim, as a subjective matter, feared for her physical safety as a result of the defendant's actions. The defendant chooses to focus on the victim's stated mindset within a narrow time frame, specifically, after she found out the dark figure was the defendant, but before she learned the full extent of his activities. Nevertheless, a review of her entire testimony and that of the responding officers reveals unequivocal evidence that outside of that particular time frame, the victim was afraid.[23] Her purchase of light sensors provides further evidentiary support. See *State* v. *Limbrecht*, 600 N.W.2d 316, 320 (Iowa 1999) (stalking victim's testimony regarding safety precautions taken as result of defendant's actions, including installation of dead bolts, extra lights and motion detectors, sufficiently supported finding that defendant induced fear in victim).

In regard to whether the victim's fear was objectively reasonable, although the defendant contrasts the present case with one in which overt threats were made, such threats are not required for a conviction under § 53a-181e. To establish a stalking violation, "[p]roof of verbal threats or harassing gestures is not essential . . . ." *State* v. *Marsala*, supra, 44 Conn. App. 95. "The stalking statute was enacted to address the situation where the criminal does not physically take an act against the person or does not verbally make a direct an[d] immediate threat of harm, but merely stalks the

---

[23] Even within that time frame, given the victim's testimony about her "mixed feelings," the evidence is at best inconsistent. "Evidence is not insufficient merely because it is conflicting or inconsistent. . . . The jury is free to determine the credibility of witnesses and the weight to give evidence." (Citation omitted.) *State* v. *Cummings*, supra, 46 Conn. App. 681.

victim. . . . The statute can be violated without a defendant's uttering a syllable, writing a word, or making a gesture." (Citations omitted; internal quotation marks omitted.) Id. Furthermore, decisions of our sister courts upholding stalking convictions against sufficiency of the evidence challenges have concluded that defendants' obsessive behaviors, even in the absence of threats of physical violence, reasonably caused their victims to fear for their physical safety. See *Garza* v. *State*, 736 N.E.2d 323, 325 (Ind. App. 2000); *State* v. *Simone*, 152 N.H. 755, 760–61, 887 A.2d 135 (2005). We conclude similarly here.

In sum, the evidence presented at trial, viewed in the light most favorable to sustaining the jury's verdict, was sufficient to establish beyond a reasonable doubt that the defendant, by wilfully and repeatedly following the victim, caused her reasonably to fear for her physical safety. Accordingly, the defendant's first claim fails.

## II

The defendant claims next that the evidence was insufficient to establish that he criminally violated a protective order in connection with the campground incident by stalking or coming within 100 yards of the victim. We disagree.

To obtain a conviction for criminal violation of a protective order, the state needed to establish that a protective order was issued in connection with a stalking charge and that the defendant violated that order. See footnotes 1 and 2. At trial, the defendant conceded that such an order had been issued and that he had been served with it; see footnote 9; and he does not contend differently on appeal. Because we have concluded in part I that the evidence was sufficient to support the defendant's conviction for stalking the victim in connection with the campground incident, it necessarily follows that the evidence was sufficient to support his conviction for criminal violation of a protec-

tive order by stalking the victim in connection with the campground incident. Accordingly, this claim cannot succeed.

## III

The defendant also claims that the evidence was insufficient to prove that he committed burglary in the second degree in connection with the home entry incident as that crime was charged by the state. We agree.

The following additional procedural history is relevant. In the information charging the defendant in connection with the home entry incident, the state alleged that "at the town of Newtown on or about the 9th day of January 2004, between the hours of 9:30 p.m. to 11:35 p.m., the [defendant] entered the dwelling of [the victim] *with the intent to criminally violate a protective order.* This crime occurred . . . in violation of Connecticut General Statutes Section 53a-102 (a) (1)."[24] (Emphasis added.) In its closing argument, the state confirmed its theory that "the intent to commit the crime . . . was a violation of a protective order." When the court instructed the jury as to this charge, its instructions were consistent with the state's allegations. The court stated in relevant part: "[I]n this case, the state is alleging *that the defendant intended to commit the crime of violation of a protective order, and the state further alleges that the violation of a protective order was the defendant's entry into the building.*"[25] (Emphasis added.) Although there were other prohibitions contained in the protective order aside from the one

[24] In a pretrial motion to dismiss, the defendant argued that the information failed to charge the offense of burglary in the second degree because the predicate crime was improper. That motion was denied. At the close of the state's case, the defendant renewed his argument in a motion for a judgment of acquittal, which was denied. In a postverdict motion for a new trial, the defendant unsuccessfully argued this claim yet again.

[25] The defendant took an exception to the entire burglary charge for the reasons stated in his earlier motions. See footnote 24.

disallowing the defendant from entering the victim's dwelling, the parties do not dispute that there was no evidence that the defendant violated any of those prohibitions.

To convict the defendant of burglary in the second degree, the state needed to establish, beyond a reasonable doubt, that he entered or remained in the victim's house unlawfully and that he did so at night *with the intent to commit a crime therein.* See General Statutes § 53a-102 (a) (1); see also *State* v. *Ramirez*, 94 Conn. App. 812, 821–22, 894 A.2d 1032, cert. denied, 278 Conn. 915, 899 A.2d 621 (2006). The defendant claims that the state failed to prove the element of "intent to commit a crime therein" because, in essence, violation of a protective order *by entering a dwelling* is not a legally viable predicate offense for burglary.[26]

---

[26] As we noted in an earlier case, "the crime of trespass *or any other crime related to the breaking and entering actions of burglary itself* may not be considered by this court to be a crime therein. In the comments to the Model Penal Code, on which Connecticut's code is based, the drafters noted that the crime a burglar intends to commit cannot be trespass, the very crime he necessarily commits when entering: There is, however, one type of crime that should be excluded from the range of offenses that will satisfy the purpose requirement of burglary, namely other trespassory offenses designed solely to protect the interests that are invaded by the unprivileged entry that the burglar necessarily makes. . . . The word therein in Subsection (1) of the Model Code provision [defining burglary] performs the same function by requiring that the intent be to commit an offense after the entry has been effected. The offense of trespass will thus have already been committed and a purpose to violate Section 221.2 [trespass] will be excluded from the range of illegal purposes that will suffice for a burglary conviction. American Law Institute Model Penal Code and Commentaries (1980), part II, § 221.1, comment, pp. 76–77." (Emphasis added; internal quotation marks omitted.) *State* v. *Wallace*, 56 Conn. App. 730, 735 n.7, 745 A.2d 216, cert. denied, 253 Conn. 901, 753 A.2d 939 (2000); see also *State* v. *Colvin*, 645 N.W.2d 449, 454 (Minn. 2002) (intent to violate order for protection merely by entering victim's residence insufficient predicate crime for first degree burglary).

Our General Assembly apparently appreciated the foregoing distinction. When it enacted the legislation that was to become §§ 53a-181e and 54-1k; see footnotes 1 and 2; it also amended General Statutes § 53a-107 (a) to provide that a person who "enters or remains in a building or any other

The state concedes that this is true but claims that the evidence nevertheless was sufficient to establish that the defendant entered the victim's dwelling with the intent to commit some other crime, namely, larceny, because there was evidence that he took some of the victim's personal papers.[27] It argues, in short, that this court may assume that the defendant was convicted on this alternate theory. According to the state, it was not required to prove an intended crime, nor was the jury required to agree as to what was the intended crime. The defendant responds that the state was bound to prove the crime as it was alleged and cannot justify the conviction on appeal on the basis of a newly articulated theory. We agree with the defendant.

Our conclusion that there was insufficient evidence to convict the defendant of burglary flows from the charging document, which, in turn, was reinforced by the state's closing argument and the court's instructions to the jury. As to the charging document, "generally speaking, the state is limited to proving that the defendant has committed the offense in substantially the manner described in the information. . . . [This requirement] is meant to assure that the defendant is provided with sufficient notice of the crimes against

premises . . . in violation of a . . . protective order issued pursuant to [§ 54-1k]" shall be guilty of criminal trespass in the first degree. See Public Acts 1995, No. 95-214, §§ 3, 4.

That legislation further directed that protective orders issued in stalking cases contain language advising those subject to the orders that "entering or remaining in a building or any other premises in violation of this order constitutes criminal trespass in the first degree." Id., § 3. Accordingly, the legislature could not have intended that such an offense, standing alone, instead constitutes burglary.

[27] The state also suggests the predicate crime could be attempted stalking. Our Supreme Court recently recognized, however, that an attempted crime is not a legally cognizable predicate offense for burglary. See State v. Flowers, 278 Conn. 533, 546–47, 898 A.2d 789 (2006) ("a person cannot be charged with entering a building intending the specific result of failing to commit a crime").

which he must defend." (Citations omitted; internal quotation marks omitted.) *State* v. *Sam*, 98 Conn. App. 13, 38, 907 A.2d 99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006); see, e.g., *State* v. *Belton*, 190 Conn. 496, 501–502, 461 A.2d 973 (1983) (improper to instruct jury that defendant could be found guilty of burglary for unlawfully entering *or* unlawfully remaining in building when information charged only unlawful entry).[28] Here, the record amply demonstrates that the state charged the defendant with and prosecuted him for the offense of burglary on the basis of intent to violate a protective order, and the defendant, in response, predicated his defense on negating the viability of that theory rather than disproving that he intended to commit larceny.[29] See footnotes 24, 25. Although a variance between the details of a crime as alleged and those ultimately proven is not necessarily fatal to a conviction; see *State* v. *Sam*, supra, 40–41; this is a case in which the additional details added to the information are so dissimilar from the theory of the case on which the state claims the jury ultimately could have found the defendant guilty that the proper conclusion is that the defendant was not given adequate notice of the charge against which he purportedly was required to defend. See id., 38 n.27.

In regard to the court's instructions, even if we were to accept the state's contention that the defendant would not be prejudiced by being convicted of a crime that he committed in a manner wholly different from

---

[28] "In the event the state offers evidence to prove that the defendant committed an offense in a manner other than that set out in the information . . . the trial court may grant the state an amendment to conform the evidence to the information, but must ensure that no prejudice to the defendant results." *State* v. *Osman*, 21 Conn. App. 299, 310–11, 573 A.2d 743 (1990), rev'd on other grounds, 218 Conn. 432, 589 A.2d 1227 (1991). No such amendment was requested in this case.

[29] We note that the defendant initially was charged with larceny in the sixth degree in connection with the home entry incident, but that charge was not pursued in subsequent versions of the information.

that charged, to conclude that he was so convicted would require us to ignore the fact that the court instructed the jury consistently with the legally nonviable theory advanced in the information. Accepting the state's argument would require us to assume that the jury disregarded the court's instruction and instead found the defendant guilty of burglary on the basis of some other, wholly unarticulated theory of liability. Connecticut's appellate courts, however, "repeatedly have stated that [t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Flowers*, 278 Conn. 533, 547, 898 A.2d 789 (2006). That indication is lacking here. In any event, "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or *fails to come within the statutory definition of the crime.* When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." (Emphasis added; internal quotation marks omitted.) *State* v. *Chapman*, 229 Conn. 529, 539, 643 A.2d 1213 (1994); see also *State* v. *Flowers*, supra, 549 (jury instructions containing misstatements of law likely to be prejudicial).

We conclude that the evidence is insufficient to sustain the defendant's conviction for burglary in the second degree because the state charged and prosecuted the defendant solely on the basis of a predicate offense that was not legally cognizable. Accordingly, that conviction must be vacated.

## IV

The defendant's next claim is that there was insufficient evidence to show that he criminally violated a protective order in connection with the home entry

incident as that crime was charged to the jury. Although the defendant has framed this issue as one of insufficiency of the evidence, we believe it is more aptly characterized as one of unpreserved instructional error and, accordingly, address it as such.[30] See, e.g., *State* v. *Gonzalez*, 222 Conn. 718, 609 A.2d 1003 (1992). We conclude

---

[30] Subsequent to oral argument in this court, we ordered the parties to file simultaneous supplemental briefs addressing the following two issues:

"1. Analyze whether the claim regarding the defendant's conviction of criminal violation of a protective order in connection with the January 9, 2004 incident is more properly framed as a claim of insufficient evidence or a claim of jury instructional error.

"2. Analyze the claim regarding the defendant's conviction of criminal violation of a protective order in connection with the January 9, 2004 incident as an unpreserved claim of improper jury instruction, with attention to the case of *State* v. *Chapman*, 229 Conn. 529 (1994), and its progeny."

In his supplemental brief, the defendant has failed to identify any authority for the proposition that a reviewing court, when determining whether sufficient evidence exists to sustain a conviction, must do so with reference to the jury charge rather than to the elements of the crime as statutorily defined and as set out in the information. We similarly are unable to locate any such authority. We therefore conclude that the defendant's claim, at base, is not that the state presented insufficient evidence that he violated a protective order but, rather, that the jurors were misled by the court's charge such that they found him guilty of committing that crime in a particular manner that lacked evidentiary support and, concomitantly, were prevented from finding him guilty in the only manner for which there *was* evidentiary support. See *State* v. *Gonzalez*, 222 Conn. 718, 723–24, 609 A.2d 1003 (1992).

The defendant insists that we still must address his sufficiency claim even if we conclude that it sounds in alleged instructional error. Although the defendant is correct that sufficiency claims must be addressed when raised, even when an appellate court already has reversed a conviction on the basis of trial error; see *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005); that does not change the fact that he has not raised such a claim, regardless of whether he has labeled it as such. See *State* v. *DeJesus*, 91 Conn. App. 47, 70, 880 A.2d 910 (2005) ("[p]utting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender" [internal quotation marks omitted]), cert. granted on other grounds, 279 Conn. 912, 903 A.2d 658 (2006); see also *Bradshaw* v. *Unity Marine Corp.*, 147 F. Sup. 2d 668, 671 (S.D. Tex. 2001) ("at the end of the day, even if you put a calico dress on it and call it Florence, a pig is still a pig").

We nevertheless note that by addressing the defendant's claim as to identity in part V, we effectively have evaluated the sufficiency of the evidence as to his conviction of criminal violation of a protective order in

that the defendant has failed to show that the alleged impropriety is a clear constitutional violation that clearly deprived him of a fair trial. Consequently, this claim fails.

The following additional procedural history is relevant. When instructing the jury, the court began by addressing the charges stemming from the campground incident. As to the charge alleging that the defendant violated a protective order in connection with that incident, the court first outlined all of the elements of that crime and explained the law as to each. Referencing the information charging that offense, the court then stated, in relevant part, that "[t]he terms of a protective order, specifically alleged to have been violated in this charge, are coming within 100 yards of the [victim] at Housatonic Meadows State Park and stalking the [victim]."

After concluding its instructions as to the charges stemming from the campground incident, the court turned to the crimes alleged in connection with the home entry incident. When instructing the jury on the count alleging that the defendant violated a protective order in connection with that incident, the court stated only that "I have previously instructed you as to the violation of a protective order, and I shall not repeat those instructions to you here. However, you should refer back to that charge in your deliberations on [the charge of violation of a protective order stemming from

connection with the home entry incident. The defendant does not dispute that two valid protective orders issued in connection with a stalking arrest were in place, that he had notice of them and that they required him to refrain from, inter alia, entering the victim's dwelling. Consequently, the only remaining question is whether there was sufficient evidence that he violated those orders. See footnote 2. In rejecting the defendant's claim that there was insufficient evidence of his identity as the perpetrator of the home entry incident; see part V; we necessarily have concluded that there was sufficient evidence that he violated the protective orders by entering the victim's dwelling.

the home entry incident].”[31] The information charging this offense in connection with the home entry incident did not specify the manner in which the defendant was alleged to have violated a protective order, and the court, accordingly, did not provide the jurors any further guidance in that regard.

It is not disputed that the defendant did not stalk or come within 100 yards of the victim in connection with the home entry incident because, at the time of that incident, she was not at home.[32] The defendant's claim, therefore, is that the court's instruction on this count, by referring back to the earlier, more restrictive instruction pertaining to the campground incident, effectively directed the jury to consider the defendant's liability on theories that lacked evidentiary support. In addition, according to the defendant, the court's instruction did not give the jury the option of finding that the defendant violated the protective order in the only way that did have evidentiary support, i.e., by entering the victim's dwelling. We disagree that the court's instruction prevented the jury from considering whether the defendant violated the protective order by entering the victim's dwelling.

Because the defendant did not object to this portion of the court's instructions, any claim as to instructional impropriety is unpreserved and must be evaluated within the framework of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review

---

[31] The parties earlier had agreed that the court need not reinstruct the jury on criminal violation of a protective order but could refer back to its earlier instruction.

[32] Furthermore, the state's theory at trial was that the defendant intended to go to the victim's home when she was not there.

the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Iassogna*, 95 Conn. App. 780, 787, 898 A.2d 237 (2006).

The record is adequate for our review, and the claim is of constitutional magnitude. See *State* v. *Youngs*, 97 Conn. App. 348, 360, 904 A.2d 1240 ("[a]n impropriety in the court's jury instruction as to an element of a crime has constitutional implications"), cert. denied, 280 Conn. 930, 909 A.2d 959 (2006). We conclude, however, that the defendant has failed to demonstrate the existence of a clear constitutional violation that clearly deprived him of a fair trial.

"Under prong three of *Golding*, a challenged jury instruction constitutes a clear constitutional violation that [unmistakably] deprives a defendant of a fair trial if it is found reasonably possible that the jury was misled by the court's instruction. . . . The standard of review for constitutional claims of improper jury instructions is well settled. In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . .

As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Hicks*, 97 Conn. App. 266, 269–70, 903 A.2d 685, cert. denied, 280 Conn. 930, 909 A.2d 958 (2006).

We have reviewed the court's instructions pursuant to the foregoing standard and are not convinced there is a reasonable possibility that the jury was misled. There is no question that the court's initial instruction as to violation of a protective order correctly conveyed the law as to the elements of that offense. It further is clear from the language used that the court's subsequent comment, regarding how the defendant was alleged to have committed that crime, was limited to the count charged in connection with the campground incident. Specifically, the court qualified that comment with the limiting language, "in this count," and "at Housatonic Meadows State Park," which would have alerted the jurors to the fact that the court was referring to the state's allegations vis-a-vis the campground incident and not the home entry incident. Moreover, the jurors had both informations with them during their deliberations, and a comparison of the two makes it apparent that the state's theory as to how the defendant violated a protective order in connection with the campground incident was narrower than its theory as to how the defendant committed that offense in connection with the home entry incident.[33] Specifically, the alleged violation of the protective order with regard to the home entry incident was not limited to stalking or coming within 100 yards of the victim. Because the court's instruction reflects this difference, it is a correct adaptation of the law to the issues and was not improper.[34]

[33] The jurors also had the protective orders, which provided that entering the victim's dwelling also would constitute a violation.

[34] Even if we were to view the court's charge as a misinstruction, it would not avail the defendant. "When a jury is misinstructed on an essential element of a crime and a reviewing court can find that the record developed at trial

On the basis of the foregoing, the defendant's fourth claim fails.

## V

The defendant's last claim is that there was insufficient evidence of his identity in connection with his conviction of all of the charges stemming from the home entry incident, i.e., that the state failed to prove that he was the person depicted on the videotape recorded by the victim's hidden camera on January 9, 2004.[35] We do not agree.

The defendant's primary argument on this issue sounds in evidentiary impropriety, not insufficiency. He claims that the court improperly allowed the victim to testify that she believed he was the person on the videotape because her testimony amounted to an impermissible lay opinion on an ultimate issue in the case. See generally *State* v. *Finan*, 275 Conn. 60, 881 A.2d 187 (2005). The defendant did not object to this testimony at trial, however, and because this claim is evidentiary and not constitutional in nature; see id., 69; it necessarily fails under the second prong of *Golding*. See *State* v. *Golding*, supra, 213 Conn. 239.

We also reject the defendant's argument that there was insufficient evidence of his identity as the perpetrator of the home entry because the individual on the videotape wore a scarf that partially obscured his face. Apart from the victim's testimony, the jury viewed the videotape and was able to assess for itself whether the

___

establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." (Internal quotation marks omitted.) *State* v. *Youngs*, supra, 97 Conn. App. 361. Our disposition of the defendant's final claim; see part V; demonstrates that we consider this criterion satisfied. See footnote 30.

[35] As we have already concluded that the defendant's conviction of stalking and burglary arising from the home entry incident was not supported by sufficient evidence, we consider this claim only with regard to his conviction of criminal violation of a protective order stemming from that incident.

individual depicted therein, on the basis of all of his physical characteristics, was the defendant. Moreover, substantial circumstantial evidence supported the jury's finding as to identity. The individual entered the victim's home on a Friday night, a time at which the defendant was aware that the victim's children would be with their father. He seemed familiar with his surroundings, initially checking the room where the victim typically kept a large dog crated. The police determined that there were no signs of a forced entry to the victim's residence; when they thereafter executed a search warrant at the defendant's residence, he immediately surrendered a key to the victim's residence that she denied ever giving him. That search warrant also uncovered items of clothing that matched those worn by the person on the videotape. Those items were not in a dresser or closet but out in the open in the defendant's bedroom.

Furthermore, the person on the videotape did not behave as would a garden variety prowler but, rather, as someone interested in obtaining personal information about the victim. He ignored a substantial amount of cash attached to the victim's refrigerator and neglected to abscond with any valuables. Instead, the individual focused his attention on the victim's calendar, her caller identification unit and her discarded mail. In the absence of any viable alternative suspect, it was not unreasonable or illogical for the jurors to infer that the defendant, who admittedly had parked near the victim's residence in the dark, multiple times per week for the better part of two years, was the individual who entered the victim's residence to forage through her personal belongings.

As we have explained, simply because evidence is circumstantial does not diminish its probative value, and the jury is entitled to make reasonable inferences from that evidence. See *State* v. *Calabrese*, supra, 279 Conn. 402–403. Jurors are not expected to check their

common sense at the courthouse door. See *State* v. *Brown*, supra, 273 Conn. 343. Given the strength of the foregoing circumstantial evidence, we cannot agree that the jury engaged in impermissible speculation. See *State* v. *Reynolds*, supra, 264 Conn. 93. We conclude that the evidence was sufficient to establish that the defendant was the person depicted on the videotape and, therefore, that his identity was proven in connection with the charge of criminal violation of a protective order stemming from the home entry incident.

In sum, the evidence presented at trial was sufficient to sustain the defendant's conviction of stalking in the third degree and criminal violation of a protective order in connection with the campground incident. The evidence was insufficient, however, to sustain the defendant's conviction of burglary in the second degree in connection with the home entry incident as that offense was charged in the information. As the state has conceded, the evidence also was lacking as to the charge of stalking in connection with the home entry incident. As to the charge of criminal violation of a protective order in connection with the home entry incident, the defendant has failed to show that he was deprived of a fair trial due to a constitutionally infirm jury instruction. Finally, the evidence was adequate to support the jury's finding as to identity in connection with the conviction of all of the charges stemming from the home entry incident.

The judgment of conviction as to stalking in the third degree and criminal violation of a protective order as charged in docket number CR03-112900T is affirmed. The judgment of conviction in docket number CR04-119481S is reversed as to stalking in the third degree and burglary in the second degree, and the case is remanded with direction to render judgment of acquittal as to those counts. The conviction of criminal violation of a

protective order as charged in docket number CR04-119481S is affirmed.

In this opinion the other judges concurred.