Hillsborough-southern judicial district
No. 2004-279

THE STATE OF NEW HAMPSHIRE

v.

FRANK SIMONE

Argued: September 29, 2005
Opinion Issued: November 30, 2005

*Kelly A. Ayotte*, attorney general (*Susan P. McGinnis*, assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

DALIANIS, J. Following a trial in the Superior Court (*Hicks*, J.), a jury convicted the defendant, Frank Simone, of stalking in violation of RSA 633:3-a, I(a). We affirm.

The jury could have found the following facts. In 2001, Coral Olson was employed by the U.S. Census Bureau as a field service representative. Olson traveled door-to-door to conduct census surveys. She would then re-contact the same respondents by telephone and by personal visit until she had obtained sufficient survey information. In January 2001, Olson went to the defendant's home to conduct a census survey. Olson gave the defendant her business card with her home phone number, and conducted several follow-up telephone calls and one follow-up personal visit to complete the census survey. After the defendant completed his census survey, however, he continued to call Olson. The defendant told Olson that he was interested in her; Olson responded that she was married and not interested in him. Nevertheless, the defendant persisted in calling her. He told Olson that he had "serious personal problems" and felt suicidal and out of control. Olson did not initiate any of these personal telephone calls. She felt extremely uncomfortable and did not want to talk to the defendant. She told him not to contact her. If she did not answer the telephone, the defendant would call repeatedly and leave messages each time until she finally answered. The defendant threatened to ruin Olson's marriage and sabotage her employment.

In August 2001, Olson contacted the Temple Police Department. She met with Officer Steven Duval and expressed her desire that the defendant cease contact. On August 18, 2001, Officer Duval spoke with the defendant about the situation. Nonetheless, the defendant continued to pursue contact with Olson.

In October 2001, Olson obtained a protective order prohibiting the defendant from contacting her. Notwithstanding the protective order, the defendant continued to call her. Olson testified that between the fall of 2001 and June 2003, the defendant placed more unwanted calls to her than

she could estimate. The defendant also sent Olson packages, which she did not open. As a result, Olson frequently contacted the Temple police.

On June 11, 2003, the defendant called Olson. She again told the defendant not to contact her. Nevertheless, he called back and left several lengthy messages on Olson's answering machine. In a 7:15 p.m. message on June 11, the defendant said, among other things, that the anger he had shown in court was not towards Olson, but that he "had a lot of anger towards [her]." He also acknowledged that he said and wrote "a lot of things."

In a 7:18 p.m. message on June 11, the defendant admitted that he had previously misrepresented himself to Olson's husband in order to obtain personal information about her and about her marriage. The defendant then said:

> I don't care if the police come and arrest me. I don't care if I go to court. And I don't care if I get seven years or 70 years. This means so much to me to tell, tell you that I'm terribly sorry and remorseful and I don't care if I rot in hell. And I know I will die in, in jail. I do not have to worry about spending seven years of my life in jail because I know unequivocally that I will die within a few months. I will die in prison because my health is very poor, and I'm not saying that for sympathy. I've lost a lot of weight. I haven't been eating a thing since Tuesday after I got out of court with you. I have not - -

At 7:21 p.m. on June 11, the defendant called again and continued:

> You know, as I was saying before, I don't, I honestly don't care and I've made the decision now, I know this is very severe and even stupid of me to call you, but I basically don't care because I, I consider on August the 13th of 2001, when you broke up with me, that my life had changed drastically. It's not gotten any better and I realize that was like, you know, that was like the nail in the coffin for me. I, I'm already dead and jail is just a place to finalize that act.

The defendant then said he "was terribly, terribly sorry over the bad things that he did, then [sic] it was worth rotting in jail for, and [he] would do it again in a heartbeat." The defendant said that "he had a lot of demons inside" but that he was not a violent person and "never entertained the thoughts of hurting [Olson]." He also admitted that he was stopped while traveling to her home late at night.

After listening to these messages, Olson called the police department and Officer Duval came to her home. Olson received another telephone call

from the defendant just as Officer Duval arrived. Officer Duval took the telephone and spoke with the defendant for about twenty minutes. Even after speaking with Officer Duval, the defendant called again and left a fourth message at 7:55 p.m. on June 11. In that message, the defendant said, "I just had a lengthy conversation with that moron, Duval. They're coming to arrest me." The defendant also said that he would be "prosecuted and face a felony charge" and stated that he would pray for Olson every night. Officer Duval left the residence at approximately 8:11 p.m. However, Officer Duval returned at 8:49 p.m. to respond to a 911 call made by Olson. While the record is silent as to what Olson reported to Officer Duval, he observed that Olson appeared upset.

Olson arrived home on June 17, 2003, to find twenty new messages from the defendant on her answering machine. At 12:15 p.m., the defendant left a message that he "was not going to jail for seven years." At 12:23 p.m., the defendant said he was "sorry it had to come to this." At 12:28 p.m., he implored Olson "not to return the things that are coming in the mail." At 12:32 p.m., 12:36 p.m., 12:39 p.m., 12:45 p.m. and 12:47 p.m., the defendant asked whether Olson was home and begged her to answer the telephone. At 12:53 p.m., the defendant said that he was sorry that he did not have her anymore, that he lost everything that he loved and that he caused her "so much pain and anguish." At 12:56 p.m., 12:58 p.m., 1:02 p.m., 1:05 p.m., 1:19 p.m., 1:25 p.m., 1:32 p.m., 1:39 p.m., 1:51 p.m., 1:59 p.m. and 2:15 p.m., the defendant again asked whether Olson was home and begged her to answer his calls. She immediately called the police department and Officer Duval came to her home. The next day, Olson called Officer Duval to report that she had received two packages from the defendant. On June 24, Olson reported to Officer Duval that she had received yet another package and a letter from the defendant. The defendant continued to call Olson and, on one occasion, the defendant said "I love you" to her.

In October 2003, a Hillsborough County Grand Jury indicted the defendant on one count of stalking under RSA 633:3-a, I(a), which criminalizes "knowingly . . . engag[ing] in a course of conduct targeted at a specific person which would cause a reasonable person to fear for his or her personal safety . . . and the person is actually placed in such fear." RSA 633:3-a, I(a) (Supp. 2005). The State had to prove at trial that: (1) the defendant knowingly engaged in a course of conduct; (2) targeted at Olson; (3) which would cause a reasonable person to fear for his or her personal safety; and (4) which actually placed Olson in fear for her personal safety. *See id.*

After the State rested, the defendant moved to dismiss the charge, contending that the State failed to prove the elements of the crime. The trial court denied the motion. The court denied the defendant's renewed

motion on the same grounds at the conclusion of the evidence. After the jury found the defendant guilty, the defendant moved to set aside the verdict, asserting essentially the same grounds. The trial court denied the motion.

On appeal, the defendant argues: (1) the State failed to present sufficient evidence to support the jury's verdict; and (2) the trial court erred in denying his motions to dismiss and/or to set aside the verdict.

We first examine the defendant's argument that there was insufficient evidence to support a finding that his conduct: (1) would cause a reasonable person to fear for his or her personal safety; and (2) actually placed Olson in fear for her personal safety. The defendant carries the burden of proving that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt. *State v. Littlefield*, 152 N.H. 331, 350 (2005) (reviewing sufficiency of evidence underlying the trial court's denial of defendant's motion to dismiss); *State v. Small*, 150 N.H. 457, 464 (2004) (reviewing sufficiency of evidence underlying the jury verdict).

The defendant argues that we must interpret the phrase, "fear for his or her personal safety," as used in the stalking statute, to require a fear of physical violence. *See* RSA 633:3-a, I(a). We need not reach the defendant's argument, however, because even if the term "fear for his or her personal safety" means a fear of physical violence, the evidence was sufficient to prove that the defendant's conduct would cause a reasonable person, and actually caused Olson, to fear physical violence by the defendant.

The defendant contends that his conduct would not cause a reasonable person to fear physical violence because he never assaulted Olson or explicitly threatened her with violence, and he "mostly apologized and expressed his continuing love" in his repeated telephone calls to her. We disagree. While there is limited case law concerning the type of conduct that would cause a reasonable person to fear for his or her personal safety in violation of the stalking statute, *Vlack v. Town of Rye & Record*, No. CIV. 98-271-M, 1999 WL 813973 (D.N.H. May 28, 1999), is instructive on its facts. In *Vlack*, the plaintiff alleged, among other things, that Delton Record, with whom she had an extramarital relationship lasting several years, filed a false police report charging that she had stalked him in violation of RSA 633:3-a (1995). *Id.* at *1-2. Record had informed the police that he had ended his relationship with the plaintiff and had instructed her never to contact him again. *Id.* at *5. Nonetheless, the plaintiff repeatedly telephoned him, sent letters to him, sent gifts to his workplace, entered onto his property and shouted at his back door, and trailed his wife to a

store. *Id.* Furthermore, Record informed the police that the plaintiff was emotionally unstable and possibly suicidal. *Id.*

The plaintiff argued that there was no probable cause to arrest her for stalking because her communications should have been viewed as "loving expressions of her devotion to Record." *Id.* The United States District Court for the District of New Hampshire disagreed, concluding that "a detached police officer, particularly under the circumstances of this case, could reasonably view those [communications] as evidence that [the] plaintiff had become obsessed with Record and, in light of the other evidence known to the officer, was stalking him and posed a potential danger to him and his family members." *Id.* The court further concluded that "a reasonable person could have perceived the plaintiff's conduct as threatening and, therefore, in violation of New Hampshire's law against stalking." *Id.* at *6.

The same reasoning applies here. Even in the absence of an explicit verbal threat of physical violence, a reasonable person could view the defendant's unrelenting telephone calls and gifts to Olson, especially in light of the defendant's articulated history of emotional instability, as evidence that the defendant was obsessed with Olson and posed a threat of physical violence to her. The defendant and Olson never had a personal relationship. In the fall of 2001, the defendant started repeatedly calling her. If she did not answer the telephone, he left message after message until she answered. Olson told the defendant to stop, and finally resorted to calling the police. In August 2001, Officer Duval spoke to the defendant but he continued to call Olson anyway. Olson obtained a restraining order in October 2001, but the defendant continued to call her. In fact, Olson testified that she could not estimate the number of unwanted telephone calls that the defendant initiated between the fall of 2001 and June 2003. He told Olson that he felt suicidal and out of control. During this time, the defendant obtained highly personal information about Olson by misrepresenting himself to her husband. He was also stopped while traveling to her home late at night.

On June 11, 2003, the defendant left several lengthy telephone messages on her answering machine, prompting Olson again to call the police department. Even after Officer Duval arrived at Olson's home and spoke with the defendant on the telephone, the defendant continued to call Olson. No more than thirty minutes after Officer Duval left Olson's home, the defendant again upset Olson, prompting her to call 911.

The defendant's conduct continued to escalate. On June 17, 2003, the defendant left twenty messages for Olson on her answering machine between 12:15 p.m. and 2:15 p.m. In sixteen of those calls, the defendant repeatedly asked Olson if she was present in her home and begged her to

answer the telephone. Olson immediately called the police. In the ensuing days, the defendant also sent Olson multiple packages and at least one letter, and continued to call her.

The evidence demonstrates that the defendant obsessively called and sent packages to Olson for several years even though Olson, the police, and the courts repeatedly and explicitly told him not to do so. He also communicated that he was emotionally unstable and suicidal. Viewing all of the evidence and reasonable inferences therefrom in the light most favorable to the State, we conclude that there was sufficient evidence to prove beyond a reasonable doubt that the defendant's conduct would cause a reasonable person to fear for his or her personal safety.

Next, the defendant argues the State failed to prove that his conduct caused Olson actually to fear for her personal safety. At trial, the State asked Olson about the impact of the defendant's conduct upon her. Olson answered, "I live in fear every day. I don't know - - I don't know what's going to happen next, or what [the defendant is] going to do." Both Olson and Officer Duval testified that Olson frequently contacted the police between August 2001 and June 2003 as a result of the defendant's conduct. In denying the defense motion to dismiss, the trial court twice noted that Olson's testimony and demeanor on the witness stand, particularly when testifying as to the effect of the defendant's conduct, gave rise to a reasonable inference that Olson actually feared the defendant.

Viewing all of the evidence and reasonable inferences drawn therefrom in the light most favorable to the State, we conclude that there was sufficient evidence to prove beyond a reasonable doubt that the defendant's conduct actually caused Olson to fear for her personal safety. *See Small*, 150 N.H. at 465. Accordingly, the jury properly convicted the defendant of stalking in violation of RSA 633:3-a, I(a) and the trial court properly denied the defendant's motions to dismiss and to set aside the verdict.

*Affirmed.*

BRODERICK, C.J., and NADEAU, DUGGAN and GALWAY, JJ., concurred.