2009 VT 74

# State of Vermont v. Kevin Ellis

[979 A.2d 1023]

No. 07-493

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed July 16, 2009

*Tracy Kelly Shriver*, Windham County State's Attorney, and *Ellen Kryger*, Deputy State's Attorney, Brattleboro, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant Kevin Ellis appeals his conviction for stalking under 13 V.S.A. § 1062. Defendant alleges, among other claims of error, that: (1) there was insufficient evidence to sustain the guilty verdict; (2) the trial court erred in not requiring the jury to reach a unanimous guilty verdict on one theory of the crime; (3) the trial court erred in not deciding defendant's motion for judgment of acquittal at the close of the State's case; (4) defendant's activities were not within the statutory definition of "course of conduct" because they were constitutionally protected activities; (5) the stalking statute is unconstitutional because the requirement that such conduct "serve no legitimate purpose" is vague and overbroad; and (6) the statute is unconstitutionally vague as applied in this case because the State was not required to prove that defendant had the intent to cause a reasonable person substantial emotional distress. We agree that the evidence was insufficient to sustain the guilty verdict and reverse the judgment of conviction. We do not reach the other claims because there will be no retrial.

¶ 2. Based on the evidence presented, the trial court found the following facts, taken in the light most favorable to the State, and disregarding any modifying evidence. Defendant and the alleged victim, Sarah S.,[1] attended the same high school and met while they both were sophomores. During their sophomore year, they had one class together. In their junior year, they had the same lunch period and shared a table together at lunchtime. The victim felt sorry for defendant, who did not have a lot of friends, and she was kind and friendly to him. During the spring of their junior year, defendant sent her an email revealing that he had a crush on her. She responded that she had a boyfriend and that there was "no chance" they could ever be more than friends. During their junior year, defendant began a practice of waiting for her

---

[1] Consistent with our policy to minimize using names of nonparties in litigation, we follow the decision of the district court to refer to the alleged victim only by her first name and the first initial of her last name. In general, we have referred to her as the victim.

outside most of her classes and at the end of the school day, trying to engage her in conversation. Defendant also gave her a few small gifts and continued to send her emails periodically. The victim included defendant on a few emails that she sent to a large group.

¶ 3. In June 2006, between their junior and senior years, defendant for the first time called the victim at her house one Saturday. During this conversation, defendant suggested that they get together some time in person. She did not reject this possibility. The next morning around 8 a.m. defendant called again. The victim was surprised and embarrassed by this call and told defendant that she could not talk then. After this call, her mother became aware of defendant's attentions and became concerned.

¶ 4. On June 26, defendant sent the victim an explanatory and apologetic email. She did not respond to this message. Defendant sent her another email on June 27 and again on June 28. She then responded, saying that she wanted to be friends but "you need to back off a little bit." Defendant responded with an expletive-filled angry email that questioned why she was punishing him, if she was trying to make him mad, why she was not interested in him, and how she could want to be friends but not actually see or talk to him. The victim was shocked and alarmed by this email and felt that defendant was angry with her. On June 30, defendant sent her an email in which he asked if she was mad at him or mad at his angry email, and asked that she give him a chance to be her friend again.

¶ 5. At some point near the time of the June 30 email, defendant approached the victim at a summer recreation program at the high school where she worked, and repeated his apologies. He asked if she would "do something" with him; she answered maybe. She cut the conversation short because she thought it was inappropriate for him to approach her at work and she was uncomfortable.

¶ 6. On July 19, the victim sent defendant an email in response to defendant's attempt in an earlier email to meet at a proposed date and time. She wrote that she was unavailable on the proposed date, stating that "it won't really work out," and ending the email with "sorry." By return email, defendant asked whether she was being sarcastic when she wrote that she was sorry that his suggested meeting date was not available. He then asked her

to help him, and admitted that he was "hoping to coax a real response by backing [her] up into a corner." He proposed that they "make rules for each other," and said he was "only trying to make [her] a friend again."

¶ 7. At some point in their interactions over the summer, the victim requested that defendant never call her at home again. In response, defendant never called her again.

¶ 8. When classes began in the fall, defendant and the victim had two classes together. Defendant resumed waiting for the victim after classes and trying to engage her in conversation. Thereafter, at some date in September 2006, she told defendant that she did not want to even be friends and that she wanted nothing to do with him. Her friends became aware that defendant was paying her unwanted attention, and began escorting her between classes and to after-school activities. If defendant attempted to engage her, they would intervene in the conversation. She repeatedly told defendant that she did not want to talk to him, and asked him to leave her alone. Defendant continued to approach her between classes. At least on one occasion, defendant attempted to engage her in conversation during one of their shared classes. The teacher was struck by how odd this behavior was, and how uncomfortable the victim looked. He spoke to her about the incident after class, and reported it to the administration.

¶ 9. Defendant attended after-school sporting events where the victim was also a spectator and stood nearby. After one game, defendant approached her and her brother and requested a ride to his own car, which was parked in an adjacent lot. She refused; she was startled and alarmed by this conduct.

¶ 10. On October 15, 2006, the victim, her brother, and her mother were shopping at a supermarket in her hometown. As they drove into the parking lot, defendant drove out. He then turned his car around, turned back into the parking lot, and parked. He then began searching for something in his vehicle. She and her family completed their shopping and were standing in the checkout line when defendant entered the store and approached her brother. Defendant asked if he knew the time; her brother pointed to the clock on the wall. Defendant then asked if he could borrow his cell phone; her brother said no. Defendant then left the store. When the family returned home, her mother told her father what had happened.

¶ 11. The victim's father is the chief of police in her hometown. On October 16, he was assisting with traffic control near the high school and saw defendant. He approached defendant and told him not to contact his daughter or to harass her in any way.

¶ 12. The next day at school, defendant approached the victim in the school library, telling her that she did not have to induce her father to talk to him and that she could have asked him herself to leave her alone. She replied that she had been doing so for months but to no avail. Defendant sent her an email that day in which he said that he "just need[ed] a friend" and that he was "only asking for some closure now."

¶ 13. Later, defendant approached the victim between classes at school. She attempted to ignore him, and her boyfriend stepped between them, told defendant to back off, and pushed defendant. School authorities intervened, and both defendant and the boyfriend were interviewed by school staff. That same day, defendant tried to talk to the victim again during class. She ignored him.

¶ 14. That week the victim had her final game of the soccer season. As her father was getting out of the family car in the school's parking lot, he saw defendant standing close by and confronted him. He swore at defendant, and told him to keep away from his family and his daughter. Defendant said he was there to pick up his sneakers from inside the school. The family car was parked in such a location so that defendant was not required to pass it in order to gain entrance to the school. The victim was not present at this incident.

¶ 15. In the course of all this conduct, defendant never threatened the victim. His most offensive email contained a veiled threat of self-harm. There is no evidence that the victim feared physical violence or unlawful restraint from defendant.

¶ 16. After the incident in the school parking lot, the victim's father contacted the Vermont State Police and asked them to investigate defendant. Two state police officers arrested defendant and interviewed him at the state police barracks. At least part of the videotape of the interview was shown to the jury as part of the evidence in this case. In the interview, defendant represented that he would not initiate further contact with the victim.[2]

---

[2] As in *State v. Lee*, 2008 VT 128, ¶ 9, 185 Vt. 110, 967 A.2d 1161, we cannot determine from the transcript what part of the VHS videotape was shown to the jury. As it came to us, the videotape was positioned in the middle of the tape at

Nevertheless, defendant was charged on October 19 with misdemeanor intentional stalking under 13 V.S.A. § 1062 for his actions during the summer and fall of 2006.[3] Both he and the victim were seventeen years of age when defendant was arrested and charged.

¶ 17. The term "stalk" is defined in 13 V.S.A. § 1061(1) and contains three elements, two of which are defined in the alternative. The first element is a "course of conduct which consists of following, lying in wait for, or harassing." *Id.* The second is that the course of conduct "serves no legitimate purpose." *Id.* § 1061(1)(A). The third element is that the course of conduct "would cause a reasonable person to fear for his or her physical safety or would cause a reasonable person substantial emotional distress." *Id.* § 1061(1)(B). Initially, the State charged defendant with intentional stalking with no specification of which of the alternative parts of the elements it charged. From the beginning, defendant argued that the State had to specify its charge more precisely and the trial judge indicated agreement. Initially, the State resisted suggestions that it provide any more specificity on the first element, but it did agree to specify with respect to the third element that defendant's conduct would cause a reasonable person substantial emotional distress. Eventually, the State narrowed its theory on the first element to "following" or "harassing," and agreed that the jury would have to be unanimous on which of these two theories defendant's conduct met for this element to be satisfied.

¶ 18. The statute contains further definitions of the alternative parts of the first element. Thus "following" means "maintaining over a period of time a visual or physical proximity to another person in such a manner as would cause a reasonable person to have a fear of unlawful sexual conduct, unlawful restraint, bodily injury, or death." *Id.* § 1061(3). "Harassing" means "actions directed at a specific person, or a member of the person's family, which would cause a reasonable person to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death, including but

a point between interviews of the defendant. The seventeen minutes of video following that point in the tape involves the interaction between two state police officers and defendant and includes the representation in the text. We infer that this is the segment that was shown to the jury. Only a small part of the seventeen minutes involves statements of the defendant. The remainder is statements from the officers on their opinion of defendant's conduct, their suggestions for the future, their predictions of what will happen to defendant, and the like.

[3] The statute contains a maximum penalty of two years in jail and a $5000 fine. 13 V.S.A. § 1062.

not limited to verbal threats, written, telephonic, or other electronically communicated threats, vandalism, or physical contact without consent." *Id.* § 1061(4). The State's theory of the case was that defendant committed the offense of stalking by intentionally engaging in a course of conduct consisting of following or harassing the victim.

¶ 19. At the close of the State's evidence, defendant made a motion for judgment of acquittal under Vermont Rule of Criminal Procedure 29, arguing that the State failed to sustain its burden of proof. The court reserved decision on this motion. Defendant raised this motion again at the close of all the evidence. The court again reserved decision, and allowed the case to be submitted to the jury, specifying that the jury had to be unanimous on the elements on which it convicted defendant, if it came to a guilty verdict. No special-verdict form was given to the jury. The jury reached a guilty verdict.

¶ 20. After the verdict, the court ruled on defendant's Rule 29 motion. Finding that "[t]he State presented not a scintilla of evidence that the defendant ever threatened" the victim and that "[a]t worst, his most offensive e-mail . . . contained a veiled threat of self-harm," the court decided that there was no evidence of harassment, apparently because it viewed the statute as requiring a threat of harm to the victim or her family members. The court determined that there was sufficient evidence of "following," because the following "continue[d] over a period of time and in such a manner that a reasonable person would fear unlawful restraint or bodily injury." The court reasoned:

> The repeated, continuous, persistent following that the defendant engaged in was, by its nature, sufficient to create such a fear, if only because it was so clearly unwanted. The defendant's persistence together with his clear disregard of the victim's and her father's expressed desires for the following to end, were sufficient to create a reasonable fear. Based upon these facts, a reasonable person might well fear that, unless he was stopped, the defendant would actually physically restrain the victim to force her to listen to him and have contact with him.[4]

---

[4] The trial court did not find that a reasonable person *would* have feared unlawful restraint, as required by the statute, but instead that a reasonable person *"might well"* have feared unlawful restraint. (Emphasis added.) Under our standard of

This appeal followed.

¶ 21. We begin with defendant's argument that the evidence was insufficient to convict him of following, and therefore of stalking. We review the denial of a Rule 29 motion for judgment of acquittal de novo, considering whether "the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." *State v. Turner*, 2003 VT 73, ¶ 7, 175 Vt. 595, 830 A.2d 122 (mem.) (quotation omitted). Judgment of acquittal is appropriate "only if the State has failed to put forth any evidence to substantiate a jury verdict." *Id.*

¶ 22. Defendant makes two main arguments in support of his Rule 29 motion: (1) as a matter of law, his conduct would not cause a reasonable person to fear unlawful restraint or bodily injury; and (2) the State was required to show that defendant had the specific intent to create a reasonable fear of unlawful restraint or bodily injury and did not meet that burden. We address the first argument and find it determinative. In addressing the first argument, we narrow it consistent with the decision of the district court that found a reasonable fear only with respect to unlawful restraint.[5]

¶ 23. The term "unlawful restraint" is not defined in the stalking law. However, 13 V.S.A. §§ 2406 and 2407 make unlawful restraint a crime with two degrees. Given the nature and purpose of the stalking law, we conclude that the definitions of the crimes of unlawful restraint apply to the stalking law. See *State v. Harty*, 147 Vt. 400, 402, 518 A.2d 30, 31 (1986) (stating that we read statutes dealing with the same general subject matter as parts of a unified statutory scheme). For the basic crime in the second degree, a person is guilty of unlawful restraint if the person knowingly restrains another person. 13 V.S.A. § 2406(a)(3).[6] The term restrain is defined to mean "to restrict substantially the

---

review our inquiry is the same as that of the district court; thus, we do not find it necessary to remand to address the specific question required by the statute.

[5] We infer that the district court believed that unlawful restraint was more likely to occur than bodily injury and focused on unlawful restraint. We agree with that assessment but note that our holding on unlawful restraint applies equally to bodily injury.

[6] With respect to a victim under eighteen years of age, there is an alternative form of unlawful restraint in the second degree that occurs when a defendant

movement of another person without the person's consent or other lawful authority," under three different circumstances. *Id.* § 2404(3). The circumstance applicable to this case is where a defendant "confin[es] the restrained person for a substantial period either in the place where the restriction commences or in a place to which the person has been moved." *Id.* § 2404(3)(C). We have held that the term "substantial" in this definition is measured by the "quality and nature of the restraint rather than just on duration." *State v. Carrasquillo*, 173 Vt. 557, 561, 795 A.2d 1141, 1146 (2002) (mem.). In that case, we held that the period of restraint of a few minutes was substantial where it involved holding a correctional facility nurse by the throat in a hostage situation. *Id.*

¶ 24. In framing his argument as to why there was insufficient evidence to support the conviction, defendant emphasizes two items missing from in the State's case: threats to restrain the victim, and the victim's subjective fear that she would be restrained. While relevant to our decision, the absence of these facts is not determinative. As defined by the Legislature, the elements of the crime do not require that defendant had threatened violent behavior or unlawful restraint in the past, or that the victim feared for her safety or that she would be restrained. Threats are commonly present in stalking situations, and aid the State's case if present, but their absence is not fatal to a stalking prosecution. Similarly, the victim's fear may be helpful to the State, if present, but the critical element of the crime is defined solely in objective terms — whether a "reasonable person" would fear "unlawful restraint" — and the absence of the victim's fear is not determinative.

¶ 25. The State and the trial court developed a theory of the main element of the case that did not depend upon threats by defendant or the victim's fear. Their theory on the objective component of the element of "following" was that defendant's conduct had become so persistent over such an extended period, and defendant ignored demands that he stop contact with the victim, that a reasonable person would fear that he would "actually physically restrain the victim to force her to listen to him and to have contact with him." In analyzing whether the facts

---

"knowingly takes, entices, or harbors" a victim. 13 V.S.A. § 2406(a)(1). This alternative specification of the crime is inapplicable to the facts of this case.

support the trial court's theory, we are aided by decisions from other jurisdictions in which courts have relied upon similar or identical theories. See, e.g., *State v. Russell*, 922 A.2d 191, 206 (Conn. App. Ct. 2007); *Garza v. State*, 736 N.E.2d 323, 325 (Ind. Ct. App. 2000); *State v. Simone*, 887 A.2d 135, 139 (N.H. 2005). In each of these cases there was no history of violence and no threat of violence, but the court affirmed a conviction for stalking. The New Hampshire Supreme Court in *Simone* explained the rationale as follows:

> Even in the absence of an explicit verbal threat of physical violence, a reasonable person could view the defendant's unrelenting telephone calls and gifts to [the victim], especially in light of the defendant's articulated history of emotional instability, as evidence that the defendant was obsessed with [the victim] and posed a threat of physical violence to her. . . .
>
> . . . .
>
> The evidence demonstrates that the defendant obsessively called and sent packages to [the victim] for several years even though [the victim], the police, and the courts repeatedly and explicitly told him not to do so. He also communicated that he was emotionally unstable and suicidal.

887 A.2d at 139-40. Essentially, the trial court here adopted the theory of *Simone*, that when unwanted persistence reaches obsession after warnings to stop, a reasonable person would have a fear of escalation to physical violence.

■ ¶ 26. We do not dispute that obsessive behavior, without threats or attempted acts of violence, can cause a reasonable person to fear unlawful restraint, but conclude that in this case defendant's actions do not rise to a level that would cause a reasonable person to have such fear. The facts of the decisions that have applied this obsession rationale are orders of magnitude more extreme than those before us. In *Simone*, the defendant met the victim when she conducted a census survey, and called her more times than she could estimate, even after she told him to cease contact and after she obtained a court protective order against him contacting her. *Id.* at 137. He expressed anger at her, sent her gifts, explained that he had serious personal problems

and was suicidal and out of control, and persisted after police intervention. *Id.*

¶ 27. *Garza* is closer to this case, but the facts are still more extreme. In that case, the victim's former work supervisor called her and sent her flowers and love notes after she insisted orally and in writing that he stop. In giving her a rose, the defendant said that the rose reminded him of her, "hurtful yet beautiful." *Garza*, 736 N.E.2d at 324. Together with flowers on another occasion was a note that spoke of hate, anger, bitterness, malice, and venom. *Id.* He frequently watched her at a gym while she was working out, and approached her at the gym and in a grocery store to which he followed her. *Id.*

¶ 28. In *Russell*, the defendant, who had dated the victim, was found looking through her dining room window at night. 922 A.2d at 196-97. He disclosed that he frequently drove by the victim's house or parked his car in the neighborhood and walked by the house. He was charged with stalking as a result of that conduct, and a protective order was issued against him. Nevertheless, he appeared at a remote campground where the victim was present with her daughters and thereafter entered her home while she was away and took personal information about her. *Id.* at 197-98.

¶ 29. There are distinctions between the present case and the foregoing decisions that have relied upon the obsession theory. Almost all the interaction between defendant and the victim occurred at school in public areas or at school-related public activities, so this case lacks most of the surreptitious activity of the reported decisions. There is no evidence that defendant tried to get the victim alone in a private setting, where unlawful restraint was possible, to force the victim to talk directly to him. When she requested, defendant ceased telephone calls to her. Further, the victim did not testify that she feared unlawful restraint or bodily injury from defendant, another distinction from the reported decisions.

¶ 30. Although the record discloses conduct that the victim may not have wanted during their junior year in high school and the summer thereafter, she did not clearly indicate that she wanted no further contact with defendant until September of their senior year, and he was arrested in October. Thus, the period in which he was on clear notice that his contact was unwanted was very short in relation to the other cases. The trial court relied upon the fact that defendant was clearly warned by the victim's father, but

this incident of outside intervention was small compared to that in most of the reported cases. There was almost no attempt to enlist the assistance of third parties, which is significant in that there was no clear message to defendant to disengage from a person in a position of authority.

¶ 31. Furthermore, this case involves high school students, and the behavior of defendant was often more awkward than deliberate.[7] While we agree that defendant's conduct was inappropriate, we are reluctant to criminalize interactions that are highly emotional but are not likely to be precursors of violence. However, we recognize the emotional distress felt by the victim, and encourage anyone in such circumstances to seek the assistance of persons in a position of authority, including the police, in order to send a clear message that the unwanted conduct must stop.

¶ 32. We recognize the case is relatively close, but we cannot conclude that a reasonable person would have feared that defendant would engage in unlawful restraint as a result of his conduct. Defendant's conduct was inappropriate and inflicted emotional distress, but it was not criminal under the stalking law as it currently exists. Accordingly, the court should have granted the motion for judgment of acquittal. Because we conclude that the court should have entered a judgment of acquittal, we do not reach the other issues raised by defendant.

*Conviction reversed and remanded for entry of judgment of acquittal.*

---

[7] The literature indicates that intrusive conduct following the termination of a relationship, including a friendship, is relatively common among adolescents and young adults. See J. Haugaard & L. Seri, *Stalking and Other Forms of Intrusive Contact in Adolescent and Young-Adult Relationships,* 69 UMKC L. Rev. 227, 229, 231 (2000) (reviewing literature and reporting on a study in which 23% of undergraduate women and 19% of undergraduate men surveyed reported that they had been subjected to post-termination intrusive behavior in high school or college). The need is to determine what part of those intrusive behavior incidents portends future violence.