******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

Robinson, C. J., and McDonald, D'Auria, Kahn,
Ecker and Keller, Js.

*Syllabus*

Pursuant to the statute (§ 46b-16a (a)) governing the issuance of certain
civil protection orders, "[a]ny person who has been the victim of . . .
stalking may make an application" for such an order, and the statute
defines "stalking" as "two or more wilful acts, performed in a threaten-
ing, predatory or disturbing manner of . . . [h]arassing . . . or sending
unwanted . . . messages to another person . . . that causes such per-
son to reasonably fear for his or her physical safety."

The plaintiff applied for a civil protection order against the defendant pursu-
ant to § 46b-16a, claiming that she feared for her life. The plaintiff and
the defendant had attended the same high school and were friends. The
plaintiff was also friends with the defendant's sister, C. Due to certain
events that occurred within the circle of friends of which the plaintiff
and the defendant had been a part, the defendant indicated to the plaintiff
that he did not want to socialize in public with her any longer. Thereafter,
while the plaintiff and C, who was in her bedroom, were talking to
each other via FaceTime, a video and audio conferencing platform, the
defendant came into C's bedroom and joined the conversation. The
plaintiff and C both teased the defendant that they were going to attend
his upcoming volleyball game, and the defendant told the plaintiff that
he did not want her to go to the game. The defendant then left C's
bedroom and began sending text messages to the plaintiff, including,
"I'll shoot you," "can't wait to kill your ass in school," among other
threatening and derogatory comments. While the plaintiff was receiving
these text messages, she continued to communicate with C via Fac-
eTime, read the messages aloud to C, and laughed. The plaintiff
responded to the text messages with a variety of comments teasing the
defendant, as well as with emojis and acronyms that indicated laughter.
Days after the foregoing incident, the plaintiff's mother discovered the
text messages and called the police, who intervened. After the police
interviewed the defendant, his father voluntarily surrendered nine fire-
arms that had been in his home. The plaintiff alleged in her application
that her fear was based on the defendant's text messages and her subse-
quent discovery that the defendant's father had firearms in his home.
The trial court conducted a hearing on the plaintiff's application, at
which it heard testimony from the plaintiff, the defendant, and C that
the defendant meant the texts as a joke and that the plaintiff knew the
texts were intended as a joke. The trial court ultimately denied the
plaintiff's application on the ground that the plaintiff had failed to estab-
lish that she in fact feared for her physical safety. In doing so, the court
applied a subjective-objective standard for purposes of assessing the
plaintiff's fear, that is, it required the plaintiff to establish that she in
fact feared for physical safety and that a reasonable person under the
existing circumstances would fear for his or her own physical safety.
The plaintiff, upon certification by the Chief Justice, pursuant to statute
(§ 52-265a), that a matter of substantial public interest is at issue,
appealed to this court from the trial court's denial of her application
for a civil protection order. *Held*:

1. The plaintiff could not prevail on her claims that § 46b-16a is ambiguous
with respect to whether to apply a subjective-objective standard for
determining whether the applicant for the civil protection order fears
for his or her physical safety, that the legislative history of the statute
supports an objective-only standard, and that any other interpretation
would yield an absurd or bizarre result, and, accordingly, the trial court
did not improperly interpret § 46b-16a as creating an subjective-objective
standard: this court applied the last antecedent rule to the term "such
person" in § 46b-16a and concluded that that phrase clearly refers back
to "another person," or the person being stalked, and, therefore, the
plaintiff, to establish fear, was required to establish that she subjectively

feared for her personal safety, in addition to showing that such fear was reasonable; moreover, this interpretation of the statute was consistent with a prior Appellate Court case that had addressed the fear element of § 46b-16a, and, contrary to the plaintiff's claim that it would be absurd to deny her application for a protection order after she had received death threats from the defendant, under the statute's clear and unambiguous language, the legislature did not intend for courts to issue protection orders in situations in which an applicant did not take the threat seriously or did not actually fear for his or her physical safety, or in situations in which any established fear was not objectively reasonable under the circumstances.

2. The trial court's findings relating to whether the plaintiff, in fact, feared for her physical safety were not clearly erroneous: the trial court credited the testimony of the defendant and C that the defendant meant the text messages as a joke and that the plaintiff was laughing as she read the messages aloud to C, and the testimony of C that the plaintiff never expressed fear when she received the text messages or later the same day, when C and the plaintiff spoke again; moreover, the plaintiff responded to the defendant's text messages with further teasing and joking, and with acronyms and emojis indicating laughter, the plaintiff testified that she did not inform her parents or anyone else about the text messages, and, in the days following the text exchange, and before her mother discovered the text messages, the plaintiff continued to communicate with C and never mentioned any fear of the defendant; furthermore, the plaintiff's challenge to the trial court's finding that the defendant's father had voluntarily surrendered all firearms in his home and that there were no more firearms there was unavailing, as no evidence presented at trial could support an inference that additional firearms were in the defendant's home after the voluntary surrender.

3. The trial court did not abuse its discretion in excluding testimony that the defendant had requested that the plaintiff provide him with nude photographs of her and testimony regarding whether the defendant ever had had suicidal thoughts or had taken medication for his mental health: the trial court properly declined to admit the testimony regarding the defendant's request for nude photographs insofar as the plaintiff had failed to establish that that request created or increased her fear for her physical safety or that the text messages were in retaliation for the plaintiff's denial of the request, as the plaintiff testified that the defendant stopped asking for nude photographs when she refused his request and that they continued to interact afterward; moreover, the trial court did not preclude all testimony regarding the defendant's suicidal thoughts or use of medication, as it allowed the plaintiff's counsel to inquire about the defendant's use of medication when he sent the text messages and at the time of his testimony at trial, as well as whether his text messages showed suicidal ideations or an intent to harm himself, and, accordingly, the trial court properly limited these inquiries to the relevant time periods.

4. The plaintiff's unpreserved claim that § 46b-16a violated the equal protection clause of the Connecticut constitution insofar as that statute had a disparate impact on women failed under the first prong of *State* v. *Golding* (213 Conn. 233), as the plaintiff failed to introduce at trial any evidence regarding this alleged disparate impact, and, therefore, the record was inadequate to review her claim.

Argued September 8—officially released December 15, 2021**

*Procedural History*

Application for a civil protection order, brought to the Superior Court in the judicial district of New Haven and tried to the court, *Wilson, J.*, who denied the application, and the plaintiff, upon certification by the Chief Justice pursuant to General Statutes § 52-265a that a matter of substantial public interest is at issue, appealed to this court. *Affirmed.*

*Randi L. Calabrese*, with whom, on the brief, was *Zachary Mazza*, certified legal intern, for the appellant (plaintiff).

*A. Ryan McGuigan*, for the appellee (defendant).

*Opinion*

D'AURIA, J. In this public interest appeal, authorized pursuant to General Statutes § 52-265a, we are called on to clarify the standard courts must apply to determine whether an applicant for a civil protection order under General Statutes § 46b-16a[1] has established the element of fear, which is necessary before such an order may issue. The plaintiff, L. H.-S., claims that the trial court improperly interpreted § 46b-16a as creating a subjective-objective fear standard, rather than a purely objective standard. She also claims that the trial court improperly interpreted the statute as limiting the time period for assessing her subjective fear and requiring proof of the intent of the defendant, N. B. Finally, the plaintiff claims that (1) the trial court abused its discretion in denying her application for a civil protection order by relying on clearly erroneous facts, (2) the trial court improperly excluded testimony regarding the defendant's requests for nude photographs of her, as well as testimony regarding his mental health history, and (3) § 46b-16a violates the equal protection clause of the state constitution.[2] We disagree with all of these claims and, accordingly, uphold the trial court's denial of the protective order.

The record and the findings set forth in the trial court's memorandum of decision disclose the following facts that are relevant to our resolution of this appeal. In March, 2020, the plaintiff and the defendant attended the same high school and became friends. At that time, the plaintiff was dating the defendant's best friend, J, and all three were part of the same group of friends who socialized together. The plaintiff also befriended the defendant's sister, C. In November, 2020, the plaintiff's mother smelled vaping fumes on the plaintiff and a group of her friends while driving them to a movie theater. The plaintiff's mother reported this incident to the other children's parents, causing the plaintiff's friends to become upset with her for "snitch[ing]" on them. Because of this incident and J's subsequent breakup with the plaintiff, she found herself ostracized from her group of friends. The defendant, however, who had not been part of the vaping incident, remained her friend, despite feeling pressure to pick between the plaintiff and J. Although the defendant and the plaintiff remained friends and continued to communicate, the defendant told the plaintiff that they could not socialize in public any longer.

On March 20, 2021, the plaintiff and C, who was in her bedroom at her house at the time, were talking to each other on FaceTime. As they were talking, the defendant came into C's bedroom and briefly joined the conversation. During this conversation, in response to the plaintiff's and C's teasing him that they were going to come and cheer him on at his upcoming volleyball game, the defendant told the plaintiff that he did

not want her to go to the game. The defendant was bothered by the teasing because he thought that, if the plaintiff went to the game, J, who also was a member of the volleyball team, would be upset and that it would put the defendant in a difficult position with his group of friends. The defendant subsequently left C's bedroom and began sending texts to the plaintiff that read, among other things, "I'll shoot you," "[c]an't wait to kill your ass in school," "I got shooters on your ass," and other derogatory and threatening comments. For a portion of the time that the defendant sent these text messages, the plaintiff remained on FaceTime with C, reading the text messages aloud to her and laughing. The plaintiff responded to the texts with a variety of teasing comments along with various emojis and abbreviations that were slang for laughing. The trial court heard testimony from the plaintiff, the defendant and C that the defendant meant the texts as a joke and that the plaintiff knew the texts were intended as a joke. The defendant has not sent any text messages to the plaintiff since March 20, 2021. In fact, the defendant is no longer enrolled in the same high school as the plaintiff.

Four days after the text conversation at issue and after checking her daughter's phone, the plaintiff's mother discovered the defendant's text messages and called the police, who subsequently interviewed both the plaintiff and the defendant. After the police interviewed the defendant, his father voluntarily surrendered nine firearms that had been in their house. The plaintiff then applied for a civil protection order with an attached affidavit in which she averred that the text messages the defendant sent made her fear for her life and that this fear was based in part on her having learned that the defendant's father had guns in their house. The trial court held an evidentiary hearing on the application over the course of three days. The trial court subsequently issued a memorandum of decision in which it denied the application for a civil protective order on the ground that the plaintiff had failed to establish that she in fact feared for her physical safety. The plaintiff then sought certification to appeal under § 52-265a, which the Chief Justice granted. We will discuss additional facts and procedural history as necessary.

We first note that we agree with the Appellate Court that the same standard of review applies in the present case as in cases involving civil restraining orders under General Statutes § 46b-15. See, e.g., *C. A.* v. *G. L.*, 201 Conn. App. 734, 738–39, 243 A.3d 807 (2020); *S. A.* v. *D. G.*, 198 Conn. App. 170, 179, 232 A.3d 1110 (2020); *Kayla M.* v. *Greene*, 163 Conn. App. 493, 504, 136 A.3d 1 (2016). "Thus, we will not disturb a trial court's orders unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion . . . we

allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Kayla M.* v. *Greene*, supra, 504. "Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . [Questions] of law [however, are] entitled to plenary review on appeal." (Internal quotation marks omitted.) Id.

I

The plaintiff's primary claim on appeal challenges the trial court's interpretation of the phrase "causes such person to reasonably fear for his or her physical safety" as clearly and unambiguously creating a subjective-objective standard for establishing fear under § 46b-16a.[3] Specifically, as to the fear element under § 46b-16a, the trial court required the plaintiff to establish that she in fact feared for her physical safety, as well as that a reasonable person under the existing circumstances would fear for his or her own physical safety. The plaintiff argues that § 46b-16a is ambiguous with respect to this standard, that legislative history supports applying an objective-only standard, and that any other interpretation would yield an absurd or bizarre result. We are not persuaded.

Our review of this claim, which requires us to construe § 46b-16a, is plenary. See, e.g., *777 Residential, LLC* v. *Metropolitan District Commission*, 336 Conn. 819, 827, 251 A.3d 56 (2020). In construing § 46b-16a, our analysis is guided by General Statutes § 1-2z, and, thus, we begin with the text of § 46b-16a. See id., 827–29. Section 46b-16a (a) provides in relevant part that " 'stalking' means two or more wilful acts, performed in a threatening, predatory or disturbing manner of: Harassing, following, lying in wait for, surveilling, monitoring or sending unwanted gifts or messages to another person directly, indirectly or through a third person, by any method, device or other means, that causes *such person to reasonably fear* for his or her physical safety." (Emphasis added.)

Neither party disputes that the phrase "reasonably fear" creates an objective standard. Rather, the plaintiff's claim focuses on the meaning of the word "such," and, in particular, whether it adds a subjective element to the standard. The statute does not define either the term "such" or the phrase "such person." Therefore, we construe the term according to its "commonly approved usage"; General Statutes § 1-1 (a); "mindful of any peculiar or technical meaning it may have assumed in the law. We may find evidence of such usage, and technical meaning, in dictionary definitions, as well as by reading the statutory language within the context of the broader legislative scheme. . . . Additionally, we may look to prior case law defining the term at issue." (Citation omitted; internal quotation marks omitted.) *777 Residential, LLC* v. *Metropolitan District Commission*, supra, 336 Conn. 831.

The parties focus on the dictionary definition of the term "such," correctly noting that Black's Law Dictionary defines it as, "[o]f this or that kind . . . [t]hat or those; having just been mentioned . . . ." Black's Law Dictionary (11th Ed. 2019) p. 1732; see also American Heritage College Dictionary (4th Ed. 2007) p. 1378 (defining "such" as "[o]f this kind," "[o]f a kind specified or implied," and "[o]f a degree or quality indicated"). According to the plaintiff, this definition confirms that "such" has two reasonable interpretations and is therefore ambiguous. Specifically, she contends that, under this definition, the phrase "such person" does not necessarily mean that the applicant herself or himself is fearful but may plausibly be interpreted to mean that "someone in the applicant's position" is fearful. The first interpretation creates a subjective standard and the second creates an objective standard. The defendant, without providing any analysis, contends that it is clear and unambiguous that the legislature intended for this language to create a subjective standard. The parties ignore, however, our relevant tools of statutory construction, specifically, the last antecedent rule, including its well established exception when the statutory language at issue includes commas.

Under the last antecedent rule, which this court has applied on numerous occasions, "[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence. Thus a proviso usually applies to the provision or clause immediately preceding it." (Footnotes omitted; internal quotation marks omitted.) 2A N. Singer & S. Singer, Sutherland Statutes and Statutory Construction (7th Ed. 2014) § 47:33, pp. 494–99. This court similarly has summarized this rule: "[A] limiting clause or phrase is read as modifying only the noun or phrase that immediately precedes it . . . unless the limiting language is separated from the preceding noun or phrase by a comma, in which case one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immediately preceding it." (Citations omitted; internal quotation marks omitted.) *Karas* v. *Liberty Ins. Corp.*, 335 Conn. 62, 102–103, 228 A.3d 1012 (2019); see id. (applying rule); see also *Corsair Special Situations Fund, L.P.* v. *Engineered Framing Systems, Inc.*, 327 Conn. 467, 475, 174 A.3d 791 (2018); *State* v. *Rodriguez-Roman*, 297 Conn. 66, 76 n.7, 3 A.3d 783 (2010). Although Connecticut appellate courts previously have not had the opportunity to apply the last antecedent rule to the term "such" or the phrase "such person," our trial courts and other jurisdictions consistently have applied this rule to the phrase "such person," holding that the phrase modifies or refers to the phrase immediately preceding it in the statute. See, e.g., *Soler* v. *Progressive Casualty Ins. Co.*, Superior

Court, judicial district of Waterbury, Docket No. CV-12-6016003-S (October 2, 2013) (56 Conn. L. Rptr. 704, 705); *Montville* v. *Loiler*, Superior Court, judicial district of New London, Docket No. CV-12-6012277-S (July 10, 2013) (57 Conn. L. Rptr. 50, 52); see also *People ex rel. Negron* v. *Superintendent*, 36 N.Y.3d 32, 37, 160 N.E.3d 1266, 136 N.Y.S.3d 819 (2020); *Vermillion State Bank* v. *Dept. of Transportation*, 895 N.W.2d 269, 272–73 (Minn. App. 2017); *State* v. *Wagner*, 295 Neb. 132, 138–39, 888 N.W.2d 357 (2016); *Board of Trustees of Firemen's Relief & Pension Fund* v. *Templeton*, 184 Okla. 281, 284–85, 86 P.2d 1000 (1939).

When we apply the last antecedent rule to the language of § 46b-16a (a), including the rule's well established exception when commas are present in the language at issue, the phrase "such person" clearly refers back to the applicant. Specifically, the statute provides in relevant part that "[a]ny person who has been the victim of sexual abuse, sexual assault or stalking may make an application to the Superior Court for relief under this section . . . . As used in this section, 'stalking' means two or more wilful acts, performed in a threatening, predatory or disturbing manner of: Harassing, following, lying in wait for, surveilling, monitoring or sending unwanted gifts or messages to *another person* directly, indirectly or through a third person, by any method, device or other means, that causes *such person* to reasonably fear for his or her physical safety." (Emphasis added.) General Statutes § 46b-16a (a). Pursuant to the last antecedent rule's stated exception, because of the presence of commas, we would interpret "such person" to refer back to "a third person" and "another person," as long as "no contrary intention appears and the construction does not otherwise impair the meaning of the sentence." (Internal quotation marks omitted.) *Republican Party of Connecticut* v. *Merrill*, 307 Conn. 470, 491, 55 A.3d 251 (2012). In this particular context, however, it would, in fact, impair the meaning of the sentence for "such person" to refer back to "a third person." Specifically, it would make no sense for the alleged stalking victim to have to prove that the third party who facilitated the stalking had to fear for their safety when the statute's stated purpose is to protect stalking victims, not the facilitators of stalking. Therefore, we conclude that the phrase "such person" plainly refers back only to "another person," that is, to the person being stalked. As a result, to establish fear, the plaintiff was required to establish that she subjectively feared for her personal safety. Additionally, "such person['s]" fear must be "reasonabl[e] . . . ." General Statutes § 46b-16a (a). This language adds an objective requirement. In other words, the plaintiff's subjective fear also had to be objectively reasonable. Thus, under our tools of statutory construction, § 46b-16a unambiguously creates a subjective-objective standard for purposes of assessing fear.

This interpretation of § 46b-16a is consistent with the first and only appellate level case addressing the fear element of § 46b-16a. In *C. A.* v. *G. L.*, supra, 201 Conn. App. 734,[4] without conducting a § 1-2z analysis of the pertinent language, the Appellate Court stated that "[t]he standard to be applied in determining the reasonableness of the victim's fear in the context of the crime of stalking is a subjective-objective one. . . . As to the subjective test, the situation and the facts must be evaluated from the perspective of the victim, i.e., did she in fact fear for her physical safety? . . . If so, that fear must be objectively reasonable, i.e., a reasonable person under the existing circumstances would fear for his or her physical safety." (Internal quotation marks omitted.) Id., 740, quoting *State* v. *Russell*, 101 Conn. App. 298, 319, 922 A.2d 191, cert. denied, 284 Conn. 910, 931 A.2d 934 (2007).

In support of this proposition, which did not appear to be challenged on appeal, the Appellate Court in *C. A.* quoted *State* v. *Russell*, supra, 101 Conn. App. 319, which, in turn, had quoted *State* v. *Cummings*, 46 Conn. App. 661, 678, 701 A.2d 663, cert. denied, 243 Conn. 940, 702 A.2d 645 (1997). In *Cummings*, the court did not apply § 46b-16a but, rather, applied one of our criminal statutes that proscribe stalking, General Statutes (Rev. to 1993) § 53a-181d, which, at the time of the incidents at issue in *Cummings*, defined stalking in the second degree as occurring "when, with intent to cause another person to fear for his physical safety, [the defendant] wilfully and repeatedly follows or lies in wait for *such other person* and causes such other person to reasonably fear for his physical safety."[5] (Emphasis added.) General Statutes (Rev. to 1993) § 53a-181d; see *State* v. *Cummings*, supra, 668. In interpreting and applying this language, the Appellate Court in *Cummings* held that it created a subjective-objective standard under which the victim had to fear for his or her physical safety and that such fear had to be reasonable based on the circumstances. See *State* v. *Cummings*, supra, 678. Given the similarity in the language used in General Statutes (Rev. to 2011) § 53a-181d, as amended by Public Acts 2012, No. 12-114, § 12; see footnote 5 of this opinion; and § 46b-16a, along with the fact that both statutes protect against stalking, we agree with the Appellate Court's application of this subjective-objective standard to § 46b-16a in *C. A.*

Nevertheless, the plaintiff argues that, even if this language is clear and unambiguous, it would be "undeniably absurd" to deny a plaintiff a protective order after she had received numerous death threats. Of course, we by no means condone the defendant's conduct, which led to tumult within at least two families and one school, and to the intervention of a police department and the court system. But it does not follow that it is absurd to conclude that, under the statute's clear

and unambiguous language, the legislature did not intend for courts to issue civil protective orders in situations in which an applicant did not take the threat seriously, did not actually fear for his or her physical safety, and any such fear, to the extent it existed, was not objectively reasonable under the circumstances. The plaintiff's absurdity argument essentially seeks to prohibit courts from considering context in assessing fear. Such an interpretation of § 46b-16a could lead to every threat, regardless of context, resulting in a civil protection order, a consequence we conclude the legislature did not intend by the language it employed.

Moreover, "[t]here are a number of statutory provisions granting the court the authority to issue protective or restraining orders." *S. A.* v. *D. G.*, supra, 198 Conn. App. 186; see, e.g., General Statutes § 53a-40e (standing criminal protective orders); General Statutes § 54-1k (criminal protective orders).[6] As amended by Public Acts 2017, No. 17-99, § 1, § 46b-16a provides an additional judicial remedy to protect those who fear for their safety. The statute's subjective-objective standard requires a careful weighing of the evidence presented. These cases can be challenging, calling for a judicial determination of whether one person's fear is real and, if it is, whether it is realistic, and then requiring the balancing of that determination against another person's liberty interests. Often, as in this case, the parties' stories may be in stark opposition. The statute and the truth-seeking function of the courts necessarily place the responsibility for issuing or declining to issue these orders squarely on the good judgment of our trial court judges as the finders of fact. It is they who are best situated to assess credibility—to determine if the applicant's fear is real and objectively reasonable—which, as we will see in part II of this opinion, often takes center stage in the determination of whether the protective order issues.

## II

We next address the plaintiff's multipronged attack on the trial court's factual findings. In addition to the fact that we do not reweigh the evidence to determine if it supports the challenged findings, it is axiomatic that "we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.) *State* v. *Lamantia*, 336 Conn. 747, 750 n.3, 250 A.3d 648 (2020). Further, "[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached," and whether we might have reached a different result were we sitting as the trial court is irrelevant. (Internal quotation marks omitted.) *Rostain* v. *Rostain*, 214 Conn. 713, 715–16, 573 A.2d 710 (1990).

The trial court found insufficient evidence to justify the issuance of a civil protection order mainly because it found the plaintiff's testimony that she was, and continued to be, in fear of her life and physical safety, not credible in light of her conduct and behavior. In other words, the trial court determined that the plaintiff failed to establish her subjective fear for her physical safety. The court found that the plaintiff did not in fact fear for her physical safety because the defendant meant the texts he sent to the plaintiff as a joke and that the plaintiff knew the texts were a joke. As a result, the trial court also discredited the plaintiff's testimony that her fear for her physical safety grew when she learned that there were guns in the defendant's household. On the basis of our review of the evidence before the trial court, we cannot conclude that these findings are clearly erroneous, although we acknowledge that another trial judge may have reached a different conclusion under these circumstances.

Specifically, the trial court credited the testimony of the defendant and C, who had testified that, not only did the defendant mean the texts as a joke but, also, at the time these text messages were sent, the plaintiff and C had been teasing the defendant that the plaintiff was going to go to the defendant's volleyball game to cheer him on. This upset the defendant, as it put him in an awkward position with J, who was his best friend and the plaintiff's former boyfriend. The defendant and C testified that the plaintiff had been laughing as she read the defendant's coarse and facially threatening texts aloud to C.[7] C further testified that the plaintiff never expressed fear at the time she received the texts or later that evening when C and the plaintiff spoke again. Screenshots taken by C while she was on FaceTime with the plaintiff the evening after the text exchange show the plaintiff smiling. In the days following the text exchange, and before her mother discovered the text messages, the plaintiff continued to communicate with C and never mentioned any fear of the defendant.

Additionally, the text conversation was not one-sided. The plaintiff responded to the defendant's texts with further teasing and jokes. In particular, she replied with various smiley faced emojis, which are slang for laughing, and texts stating, "[a]we ur so sweet," "too bad so sad," "DAMNNN OK SHORT ASS MF," and "scaryyyyy." Further, the plaintiff testified that she did not inform her parents or anyone else about the texts. From this evidence, we cannot hold that the trial court clearly erred in finding that the defendant meant the texts as a joke and that the plaintiff knew the texts were a joke and, therefore, did not fear for her physical safety.

Nevertheless, we note that the facts that the plaintiff laughed in response to the defendant's text messages and reacted in ways that at least suggested that she

recognized his texts were jokes do not mean that such conduct requires the denial of a civil protective order. Even adults—let alone children—react differently to perceived threats, and a joking reply does not necessarily mean that the recipient of a perceived threat was not in fear at the time the threat was made or later upon further reflection. Faced with these or similar facts in another case, another trial judge might make different credibility determinations and findings regarding a plaintiff's fear. Under our applicable standard of review in the present case, however, we cannot hold that the trial court's factual findings were clearly erroneous regarding the plaintiff's fear.

The plaintiff also challenges the trial court's finding that the defendant's father had voluntarily surrendered all firearms in his household to the police and that there were no additional firearms in the house. In support of its finding that there were no additional firearms in the defendant's house after his father voluntarily surrendered nine firearms to the police, the trial court credited the testimony of the defendant, who testified that, although at the time he sent the text messages at issue, there were firearms in his house, he had never seen them and did not have access to them. Additionally, Sergeant Robert Mulhern testified that the defendant's father voluntarily had surrendered nine firearms on the day that the plaintiff's mother contacted the police regarding the text messages. The defendant's father represented to Mulhern that these were all the firearms in the house. No other evidence presented at trial could support an inference that additional firearms were in the defendant's home after the voluntary surrender. Moreover, understanding that the trial court could not be 100 percent certain that the defendant's father had surrendered all of the firearms he had in the house, the plaintiff cannot establish harm because the defendant's access to these guns ultimately played no role in the trial court's determination of the plaintiff's subjective fear. The trial court did not credit the plaintiff's testimony that she was fearful when she received the defendant's text messages or that she grew more fearful upon learning that there had been firearms in the defendant's house. Whether any firearms remained in the defendant's house does not alter this fact.

Thus, we conclude that none of the trial court's findings was clearly erroneous.

### III

The plaintiff also claims that the trial court abused its discretion by improperly excluding (1) testimony that the defendant had requested that the plaintiff provide him with nude photographs of her; and (2) testimony about the defendant's mental health history, including whether he ever had suicidal thoughts or ever had taken medication for his mental health. The defendant responds that the trial court properly excluded

this testimony because it was irrelevant.

Evidentiary rulings in relation to a civil order of protection are reviewed under the same well established standard as in other cases. See, e.g., *S. A.* v. *D. G.*, supra, 198 Conn. App. 183–84. "[R]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . The trial court has wide discretion to determine the relevancy of evidence and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Kalil*, 314 Conn. 529, 540–41, 107 A.3d 343 (2014).

Applying these principles to the present case, we conclude that the trial court did not abuse its discretion in determining that the contested evidence was not relevant and, thus, inadmissible.

A

As to the requests for nude photographs, on direct examination, the plaintiff was asked whether the defendant ever had asked her to send him such photographs. The defendant's counsel objected on the basis of relevance, to which the plaintiff's counsel responded that he was laying a foundation to show "retaliatory behavior" on the defendant's part. The trial court granted the plaintiff's counsel leeway to establish this foundation. The plaintiff then testified that the defendant had asked her for nude photographs a "couple [of] times" but stopped after she refused his requests. Additionally, she testified that, after these requests, she and the defendant continued to interact as friends, although their relationship was more distant.

The trial court then struck the plaintiff's testimony, explaining that it "didn't understand how [the requests for nude photographs] leads up to the retaliatory text messages that she got regarding, 'I'll kill you.' . . . I can't connect the naked pictures to those text messages saying, 'I'll kill you.' I thought you were going to say that she—when she refused to send the naked pictures, that he immediately texted her and was kind of irate with her for not sending them, which then continued and led up to that, but that's not—you just stopped . . . ." The plaintiff's counsel then attempted to clarify that the plaintiff's testimony showed the changes in the defendant's temperament, to which the trial court responded that it did not "make the connection . . . . And she's a young girl. To have her testify as to that, I'm striking that testimony."

The plaintiff argues that the trial court improperly excluded her testimony based on its prejudicial effect

on her despite its relevance. Contrary to the plaintiff's contention, however, the trial court did not exclude this testimony on the ground of prejudice but because it determined the testimony to be irrelevant in light of the plaintiff's failure to connect it to the text messages at issue. Although it is true that the Appellate Court has explained that, "obsessive behaviors, even in the absence of threats of physical violence, [may] reasonably [cause] their victims to fear for their physical safety"; (internal quotation marks omitted); *Kayla M.* v. *Greene*, supra, 163 Conn. App. 506; as the trial court noted, despite some leeway, the plaintiff failed to establish that the defendant's requests for nude photographs created or increased her fear for her physical safety or that the text messages at issue were in retaliation for the plaintiff's denial of these requests. Rather, she testified that the defendant stopped asking her for these photographs when she refused his requests and that they continued to interact afterward. Although another judge might have admitted this testimony, in light of the lack of connection between this testimony and the text messages at issue, we cannot hold that the trial court abused its discretion.

B

The plaintiff's counsel sought to question the defendant about any mental health history he had, including whether he was taking medication for any mental health conditions or had had any suicidal ideations. The plaintiff's counsel first asked the defendant if he currently was taking any medications, to which the defendant responded in the negative. As a follow-up, the plaintiff's counsel inquired whether he was taking any "mental health medication . . . ." The defendant's counsel objected on the grounds of privilege, relevance, and prejudice. The trial court sustained the objection in general but permitted the plaintiff's counsel to inquire into whether the defendant had taken any such medication at or about the time of the text messages at issue, as well as whether he continued to take those medications. The defendant testified that he was not on any medication, including any mental health medications, at the time of the text conversation.

Subsequently, in reviewing the text messages that the defendant sent the plaintiff, her counsel asked the defendant whether his texts stating, "I'd rather die than talk to you," and "I'd rather die than be friends with you," were conveying an intent to harm himself or suicidal ideations. The defendant responded in the negative and clarified that he meant those texts as a joke, albeit an inappropriate and bad joke. The plaintiff's counsel followed up by asking if the defendant ever had been suicidal, to which the defendant's counsel objected on the ground of relevance. The trial court sustained the objection.

Based on this record, we cannot conclude that the

trial court abused its discretion by placing limits on the defendant's testimony. The trial court did not preclude all testimony into these areas of inquiry. The plaintiff's counsel was allowed to ask the defendant about his medication usage at the time he sent the text messages and at the time of his testimony at trial, as well as about whether his text messages showed suicidal ideations or an intent to harm himself. The plaintiff's counsel was prevented from asking the defendant only about whether he *ever* took medication for his mental health or *ever* had suicidal ideations. The trial court merely limited these inquires to the relevant time periods, and, as a result, we cannot conclude that it abused its discretion.

IV

Finally, the plaintiff claims that § 46b-16a violates the equal protection clause of the state constitution. See footnote 2 of this opinion. Although she admits that this statute is facially neutral, she argues that it has a disparate impact on women, "as stalking more often affects women than men." The plaintiff concedes that she did not raise this claim before the trial court but nevertheless seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

To establish her claim that § 46b-16a, a facially neutral law, should be treated as if it classifies individuals on the basis of sex, the plaintiff was required to show that the law has a disproportionate impact on women. See, e.g., *Broadnax* v. *New Haven*, 294 Conn. 280, 300–301, 984 A.2d 658 (2009). As a result, the plaintiff was required to demonstrate some factual basis for her assertion that women are affected disproportionately under § 46b-16a. The plaintiff did not provide any evidence in this regard at trial,[8] and, thus, the record is inadequate to review her claim. See, e.g., *State* v. *Dyous*, 153 Conn. App. 266, 277–79, 100 A.3d 1004 (2014) (equal protection claim was not reviewable under first prong of *Golding* because defendant did not offer any evidence at trial to establish disparate impact), appeal dismissed, 320 Conn. 176, 128 A.3d 505 (2016); *State* v. *Turner*, 133 Conn. App. 812, 839, 37 A.3d 183 (equal protection claim was not reviewable under first prong of *Golding* because facts defendant alleged were not part of record), cert. denied, 304 Conn. 929, 42 A.3d 390 (2012). Accordingly, the plaintiff's equal protection claim fails under the first prong of *Golding* and is not reviewable. See, e.g., *State* v. *Rodriguez*, 337 Conn. 175, 186–87, 252 A.3d 811 (2020) ("[u]nder the first prong of *Golding*, for the record to be adequate for review, the record must contain sufficient facts to establish that a violation of constitutional magnitude has occurred").

The trial court's denial of the plaintiff's application for a civil protective order is affirmed.

In this opinion the other justices concurred.

\* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we decline to identify any party protected or sought to be protected under a protective order that was issued or applied for, or others through whom that party's identity may be ascertained.

\*\* December 15, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We note that, although § 46b-16a has been amended since the events at issue in this case; see Public Acts 2021, No. 21-104, § 17; that amendment is not relevant to this appeal. We therefore refer to the current revision of the statute.

[2] Article first, § 20, of the Connecticut constitution provides in relevant part: "No person shall be denied the equal protection of the law . . . ."

[3] The plaintiff also claims that, in determining whether she established the element of fear, the trial court improperly interpreted § 46b-16a by (1) limiting its consideration of the evidence to her conduct at the time she received the alleged threats, and (2) including consideration of the defendant's intent. Both claims lack merit.

The plaintiff is correct that § 46b-16a clearly and unambiguously does not limit the time period for assessing her subjective fear. See *State* v. *Russell*, 101 Conn. App. 298, 319–20, 922 A.2d 191 (in assessing fear element under General Statutes (Rev. to 2003) § 53a-181e, court considered entirety of victim's testimony and was not limited to particular time frame), cert. denied, 284 Conn. 910, 931 A.2d 934 (2007). The plaintiff is incorrect, however, that the trial court limited its consideration of the evidence regarding her fear to the time that she received the text messages. The trial court specifically "consider[ed] all of the evidence, and the totality of the circumstances," including the nature of the defendant's text messages, the plaintiff's responses to those text messages, and her demeanor and conduct both when the text messages were sent and afterward. The trial court simply did not credit the plaintiff's testimony that the text messages made her fear for her life and physical safety, and that this fear grew over time. This court cannot reweigh a witness' credibility.

As for the trial court's reliance on the defendant's intent, the plaintiff misconstrues the trial court decision. See *S. B-R.* v. *J. D.*, 208 Conn. App. 342, 348–49, 351, A.3d (2021) (explaining that it is plaintiff's apprehension, not defendant's thoughts, action or intent, that is relevant); *C. A.* v. *G. L.*, supra, 201 Conn. App. 742 n.7 ("[t]he statute makes no mention of the defendant's intent with respect to the element that he caused the plaintiff to fear for her physical safety" (emphasis omitted)). The trial court did not require the plaintiff to establish the defendant's intent; nor did it premise its finding of her subjective absence of fear on the defendant's intent. Rather, after considering the evidence, the trial court credited the testimony of the defendant and C that, not only did he intend his comments to be a joke but that the plaintiff reacted in a way that showed she recognized that he was joking, including by laughing with C, teasing the defendant, appearing to be happy following the text conversation, and not reporting the text conversation to her parents. As the Appellate Court has explained, "[t]he [trial] court's conclusion must be evaluated with the nature and the history of [the parties'] relationship in mind. Context is important." *C. A.* v. *G. L.*, supra, 742–43. In the present case, the trial court considered context in assessing the plaintiff's subjective fear, including the plaintiff's own actions and demeanor.

[4] The plaintiff argues that *C. A.* is inconsistent with *S. A.* v. *D. G.*, supra, 198 Conn. App. 191, which, she claims, required the plaintiff to establish only an objectively reasonable fear under § 46b-16a. But the plaintiff's fear was not at issue on appeal in *S. A.* Rather, that appeal focused on whether, to secure a civil protection order, the plaintiff was required to establish that the defendant had been lying in wait for her. See id., 190.

[5] In 2012, the legislature amended General Statutes (Rev. to 2011) § 53a-181d to define stalking as occurring "when . . . [s]uch person knowingly engages in a course of conduct directed at a specific person that would *cause a reasonable person* to fear for such person's physical safety or the physical safety of a third person . . . or . . . [s]uch person intentionally, and for no legitimate purpose, engages in a course of conduct directed at a specific person that would cause a reasonable person to fear that such person's employment, business or career is threatened, where (A) such conduct consists of the actor telephoning to, appearing at or initiating communication or contact at such other person's place of employment or business, provided the actor was previously and clearly informed to cease such conduct, and (B) such conduct does not consist of constitutionally protected

activity." (Emphasis added.) Public Acts 2012, No. 12-114, § 12. The Appellate Court since has interpreted this amended language as creating an objective-only fear standard. See *Kayla M.* v. *Greene*, supra, 163 Conn. App. 505–506.

[6] The plaintiff also argues that the plain and unambiguous language of § 46b-16a, as amended by Public Acts 2017, No. 17-99, § 1 (P.A. 17-99), yields a bizarre result in that it conflicts with the legislature's intent, as evidenced by the legislative history surrounding the 2012 amendment to the criminal statutes that proscribe stalking, to use the reasonable person standard of fear to ensure a more inclusive opportunity for stalking victims to achieve protection. The short answer is that we may not consider legislative history in determining whether a statute is ambiguous, absurd, or bizarre. See, e.g., *State* v. *Bischoff*, 337 Conn. 739, 746, 258 A.3d 14 (2021). The longer answer is that the legislative history does not support the plaintiff's argument. It is true that, in 2012, the legislature amended the criminal statutes that proscribe stalking so that the fear element was based on an objective-only standard. See Public Acts 2012, No. 12-114, § 12; see also *Kayla M.* v. *Greene*, supra, 163 Conn. App. 505–506. This amendment clearly shows that the legislative was aware of the Appellate Court's jurisprudence interpreting the prior versions of these statutes as having a subjective-objective fear standard and intended to change the standard in the criminal context. See *State* v. *Bischoff*, supra, 754–55. By contrast, the original version of § 46b-16a, enacted in 2014, defined stalking to be "as described in sections 53a-181c, 53a-181d and 53a-181e . . . ." Public Acts 2014, No. 14-217, § 186. As a result, stalking, under § 46b-16a as originally enacted, was synonymous with the criminal definition of stalking, which, as explained, applied an objective-only standard. In 2017, however, the legislature amended § 46b-16a by altering the definition of stalking; see P.A. 17-99, § 1; although no similar amendment was made to the criminal statutes that proscribe stalking. If the legislature had intended for the fear element under § 46b-16a to continue to be subject to an objec-tively-only standard, it would not have had to alter the definition of stalking in 2017. Rather, by amending the definition of stalking in 2017, the legislature clearly departed from the standard applied under the criminal statutes that proscribe stalking.

[7] Specifically, C testified that, while she and the plaintiff were on FaceTime, the plaintiff "was reading the text that my brother was sending her out loud. And she was laughing about them. She had to take breaks in between reading them because she had to catch her breath; she was hysteri-cally laughing at them because she knew he was kidding." The plaintiff herself had even admitted that, when the text messages first began, she and C were teasing the defendant, joking, and laughing.

[8] In her brief to this court, the plaintiff relies on various articles, reports, and statistics in support of her argument that women are the victims of stalking more often than men. It is well established, however, that this court cannot find facts, and a party may not supplement the factual record with facts that were not presented at trial. See, e.g., *State* v. *Edwards*, 314 Conn. 465, 496, 102 A.3d 52 (2014); *State* v. *Turner*, 133 Conn. App. 812, 839, 37 A.3d 183, cert. denied, 304 Conn. 929, 42 A.3d 390 (2012).